765 F.2d 569
 H.D. FITZPATRICK, Jr., Individually and as Director of the
Bank Josephine, Prestonsburg, Kentucky, an insured
State nonmember bank, Petitioner,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.
 No. 84-3129.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 4, 1984.
Decided June 19, 1985.
 
 James G. Apple (argued), James D. Moyer, John A. Bartlett, Stites & Harbison, Louisville, Ky., for petitioner.
 John C. Deal (argued), Regional Counsel, Columbus, Ohio, Arthur L. Beamon, Asst. Gen. Counsel, Federal Deposit Ins. Corp., Washington, D.C., for respondent.
 Before EDWARDS* and MARTIN, Circuit Judges; and BROWN, Senior Circuit Judge.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case deals with the responsibilities of bank directors in policing insider loans. The petitioner, Henry Davison Fitzpatrick, Jr., seeks review of a decision and order of the Federal Deposit Insurance Corporation assessing him $1,000 in civil money damages for his failure to exercise ordinary care as a bank director, pursuant to the Financial Institutions Regulatory and Interest Rate Control Act of 1978. We affirm.
 
 Facts
 
 2
 Fitzpatrick was and is president and a director of The Bank Josephine, Prestonsburg, Kentucky, an insured state nonmember bank. He is also a substantial minority shareholder. The controlling interest is held by members of the McGuire family.
 
 
 3
 These proceedings arise from Fitzpatrick's votes at meetings of the bank's board of directors on July 9, 1981, and August 27, 1981. At the time of the first meeting, the other directors were Leo Raymond McGuire, Everett Earl McGuire, Ervin Akers, and chairman Earl R. McGuire, father of Leo Raymond and Everett Earl McGuire. Earl R. McGuire died sometime in August 1981, after the second meeting, but was not present at either meeting.
 
 
 4
 At the July 9 meeting, Leo Raymond McGuire proposed that Bank Josephine make a $500,000 participation in a $2,100,000 loan to his father to buy certain receivables. The loan would be originated by First State Bank & Trust Company of Ashland, Kentucky, which would retain $1,100,000 of the loan. The loan would be secured by floor plan financing[1] and would further be secured by approximately $4,000,000 in collateral. Based solely on these representations, Fitzpatrick, Akers, and Leo Raymond McGuire voted to approve the loan; Everett Earl McGuire abstained.
 
 
 5
 The money from the loan went in fact to Grayson Loan Company, a corporation owned by the McGuire brothers. It is readily apparent from the loan agreement, signed by Fitzpatrick on behalf of Bank Josephine on August 3, 1981, that Grayson Loan Company would receive the loan proceeds. Although collateral for the loan included real estate and pledges of certain accounts receivable and floor plan loans made to affiliates of Grayson Loan Company, the only marketable securities pledged were bank stocks with a book value of $1,196,110. Bank Josephine apparently had a pro rata share of total collateral, subject to a provision that the first $600,000 in repayment of principal would go to First State Bank.
 
 
 6
 At the August 27 meeting the board approved the extension of a $750,000 line of credit to Grayson. Fitzpatrick and Akers voted in favor, and the McGuire brothers abstained. This line of credit was to be secured by 270,100 shares of Citizens Deposit Bank and Trust, Vanceburg, Kentucky. That stock was pledged to and in the possession of the First National Bank, Louisville, Kentucky, for a debt owed to that bank. The McGuires represented that the book value of the stock was in excess of the prior debt by $500,000. The extension of credit was disbursed to Grayson over several installments, beginning on October 8, 1981. The final installment, on December 4, 1981, represented disbursement in full.
 
 
 7
 On October 8 and 9, 1981, Fitzpatrick met with FDIC officials in Washington, D.C., and Columbus, Ohio, to express concern about the quality of Bank Josephine's loan portfolio and to request the FDIC's assistance. Fitzpatrick also had a number of other meetings with federal and state regulators. As a result of these meetings, an FDIC examiner visited Bank Josephine on November 23, 1981, and advised Fitzpatrick and Leo Raymond McGuire that the combined total of the loans to Grayson exceeded Bank Josephine's lending limits. Subsequently during the May 24, 1982, examination of Bank Josephine, FDIC examiners cited these loans as violating both the lending limits and the collateral requirements.
 
 
 8
 The Bank Josephine took no decisive action to correct the violations, even in the face of continued FDIC pressure. Fitzpatrick was the sole exception; he repeatedly spoke with the McGuires about the need to correct the violations and tried to get the board to take a more aggressive stance toward compliance. Faced with Bank Josephine's inertia, the FDIC examiner on October 13, 1982, formally recommended that the FDIC assess civil money penalties. Even after this it was not until December 29, 1982, that the bank's counsel informed the FDIC that the $750,000 line of credit had been paid off and that the $500,000 participation loan had been collateralized by $600,000 in bank stock.
 
 
 9
 The FDIC formally initiated these administrative proceedings to assess penalties against the directors, including a $1,000 penalty against Fitzpatrick, on February 7, 1983. There was a hearing before Administrative Law Judge James D. Burroughs on June 23, 1983, and Judge Burroughs recommended assessment of the penalties in a careful and detailed Recommended Decision on October 21, 1983. The FDIC adopted his findings, conclusions, and proposed order in its full Decision and Order, McGuire, No. FDIC-83-21K-A (F.D.I.C. Jan. 30, 1984), and Fitzpatrick appealed to this court pursuant to section 18(j)(3)(D) of the Federal Deposit Insurance Act, 12 U.S.C. Sec. 1828(j)(3)(D). Akers prosecuted a separate appeal to this court, but it was subsequently dismissed at his request. Akers v. FDIC, No. 84-3139 (6th Cir. dismissed May 4, 1984).
 
 The Lending Limit
 
 10
 At the time these transactions took place, section 23A of the Federal Reserve Act provided in relevant part:
 
 
 11
 No member bank shall (1) make any loan or any extension of credit to, or purchase securities under repurchase agreement from, any of its affiliates, or (2) invest any of its funds in the capital stock, bonds, debentures, or other such obligations of any such affiliate, or (3) accept the capital stock, bonds, debentures, or other such obligations of any such affiliate as collateral security for advances made to any person, partnership, association, or corporation, if, in the case of any such affiliate, the aggregate amount of such loans, extensions of credit, repurchase agreements, investments, and advances against such collateral security will exceed 10 per centum of the capital stock and surplus of such member bank, or if, in the case of all such affiliates, the aggregate amount of such loans, extensions of credits, repurchase agreements, investments, and advances against such collateral security will exceed 20 per centum of the capital stock and surplus of such member bank.
 
 
 12
 12 U.S.C. Sec. 371c (emphasis added). Section 23A has since been revised throughout, but those revisions apparently would have no effect on this issue. See Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97-320, Sec. 410(b), 96 Stat. 1469, 1515-20 (Banking Affiliates Act of 1982) (codified as amended at 12 U.S.C. Sec. 371c). The provisions of section 23A are made applicable to nonmember insured banks by section 18(j)(1) of the Federal Deposit Insurance Act, 12 U.S.C. Sec. 1828(j)(1).
 
 
 13
 The revision of section 23A incorporates a definition of "affiliate," 12 U.S.C. Sec. 371c(b)(1), but at the time of these transactions the term was defined in section 2(b) of the Federal Reserve Act, which reads in relevant part:
 
 
 14
 (b) Except where otherwise specifically provided, the term "affiliate" shall include any corporation, business trust, association, or other similar organization--
 
 
 15
 * * *
 
 
 16
 (2) Of which control is held, directly or indirectly, through stock ownership or in any other manner, by the shareholders of a member bank who own or control either a majority of the shares of such bank or more than 50 per centum of the number of shares voted for the election of directors of such bank at the preceding election, or by trustees for the benefit of the shareholders of any such bank; or
 
 
 17
 (3) Of which a majority of its directors, trustees, or other persons exercising similar functions are directors of any one member bank.
 
 
 18
 12 U.S.C. Sec. 221a(b).
 
 
 19
 Grayson was an affiliate of Bank Josephine, and loans to Grayson Loan Company thus came within the limits of section 23A. Loans to Grayson Loan Company also came within the broader proscriptions of section 22(h) of the Federal Reserve Act, 12 U.S.C. Sec. 375b, made applicable to nonmember insured banks by Federal Deposit Insurance Act Sec. 18(j)(2), 12 U.S.C. Sec. 1828(j)(2). The lending limits of section 22(h) are implemented by the Federal Reserve Board's Regulation O, which reads in relevant part:
 
 
 20
 (c) Aggregate Lending Limit. No member bank may extend credit to any of its executive officers or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit by the member bank to that person and to all related interests of that person, exceeds the lending limit of the member bank specified in section 215.2(f) above.
 
 
 21
 12 C.F.R. Sec. 215.4(c) (footnote omitted). The definition of the lending limit in section 215.2(f) read, at the time of the these transactions:
 
 
 22
 (f) The "lending limit" for a member bank is an amount equal to the limit on loans to a single borrower established by section 5200 of the Revised Statutes, 12 U.S.C. 84. This amount is 10 percent of the bank's capital stock and unimpaired surplus or any higher amount permitted by section 5200 of the Revised Statutes for the types of obligations listed therein as exceptions to the 10 percent limit. A member bank's capital stock and unimpaired surplus equals the sum of (1) the "total equity capital" of the member bank reported on its most recent consolidated report of any condition filed under 12 U.S.C. Sec. 1817(a)(3), (2) any subordinated notes and debentures approved as an addition to the member bank's capital structure by the appropriate Federal banking agency, and (3) any valuation reserves created by charges to the member bank's income.
 
 
 23
 12 C.F.R. Sec. 215.2(f).
 
 
 24
 According to the FDIC's Report of Examination, Bank Josephine's limit under section 23A was $821,650, and its limit under section 22(h) and Regulation O was $888,600. When the participation loan and the line of credit are aggregated as being both to Grayson Loan Company, the amount actually disbursed exceeded both limits on November 17, 1981, and thereafter until December 21, 1982. If the mere availability of the line of credit violates the Act, then both limits were exceeded from August 27, 1981, until December 21, 1982. Fitzpatrick concedes on appeal that it was proper to aggregate the loans to find violations of both provisions.
 
 The Collateral Requirements
 
 25
 Section 23A of the Federal Reserve Act stated in relevant part at the time of these transactions:
 
 
 26
 Within the foregoing limitations, each loan or extension of credit of any kind or character to an affiliate shall be secured by collateral in the form of stocks, bonds, debentures, or other such obligations having a market value at the time of making the loan or extension of credit of at least 20 per centum more than the amount of the loan or extension of credit, or of at least 10 per centum more than the amount of the loan or extension of credit if it is secured by obligations of any State or of any political subdivision or agency thereof.
 
 
 27
 12 U.S.C. Sec. 371c.
 
 
 28
 For the participation loan, Fitzpatrick appears to concede that the only collateral meeting the statutory requirements then applicable was the bank stock. The only valuation of the bank stock available is its book value of $1,196,110, obviously far less than 120% of the total $2,100,000 loan. Although the Banking Affiliates Act of 1982 enacted more liberal requirements for acceptable collateral, Pub.L. No. 97-320, Sec. 410(b), 96 Stat. 1469, 1518-19 (codified at 12 U.S.C. Sec. 371c(c)), those requirements are applicable only to transactions entered into after October 15, 1982. Id. Sec. 410(c), 96 Stat. at 1520.
 
 
 29
 Fitzpatrick does not dispute that there was at least a technical violation of section 23A with the participation loan, but he argues that the line of credit was adequately secured. He contends that Bank Josephine had an unperfected security interest in the bank stock pledged to First National Bank, Louisville. Although the record indicates only that the book value of the stock shares in excess of the prior debt was $500,000, presumably the total value of the stock exceeded 120% of $750,000. The FDIC contends that only a perfected security interest meets the statutory requirement.
 
 
 30
 The requirement that loans to affiliates be "secured by collateral" has been a part of section 23A since it was added to the Federal Reserve Act by the Banking Act of 1933, ch. 89, Sec. 13, 48 Stat. 162, 182 (codified as amended at 12 U.S.C. Sec. 371c). The current version continues to require that loans to affiliates be "secured at the time of the transaction by collateral." 12 U.S.C. Sec. 371c(c)(1).
 
 
 31
 Fitzpatrick argues that the Uniform Commercial Code should be used in interpreting "secured by collateral." The Uniform Commercial Code was first promulgated in 1951; it was adopted in Kentucky in 1958. The Code is important in the application of section 23A to the present case, but it does not tell us what Congress meant in 1933.
 
 
 32
 Instead, authoritative and more or less contemporaneous guidance may be found in the American Law Institute's 1941 Restatement of Security:
 
 
 33
 Sec. 10. Contract to Pledge.
 
 
 34
 (1) Subject to the conditions stated in Secs. 6 to 8, a contract for the immediate creation of a pledge unaccompanied by delivery of the chattel does not create a pledge, but if an obligation exists or arises which it is the purpose of the transaction to secure, the intended pledgee acquires an equitable interest in a specific chattel enforceable against the intended pledgor, but not against a bona fide purchaser nor against attaching or levying creditors who have become creditors of the intended pledgor without notice of the equitable interest.
 
 
 35
 Restatement of Security Sec. 10(1) (1941); accord Taplinger v. Northwestern National Bank, 101 F.2d 274, 276 (3d Cir.1938). The security in this case would, prior to the enactment of the Uniform Commercial Code, have been a contract to pledge, and possibly would have been a valid pledge if the First National Bank was in fact notified of the pledge. Restatement of Security Secs. 1, 8 (1941). But see Liberty National Bank & Trust Co. v. Louisville Trust Co., 295 Ky. 825, 829, 175 S.W.2d 524, 527 (1943) (holding that possession of the thing pledged must be delivered by the pledgor to the pledgee in order to create the lien). An unperfected security interest under the Uniform Commercial Code is valid against the debtor, but not against bona fide purchasers or lien creditors without knowledge of the security interest. Ky.Rev.Stat. Secs. 355.9-201, 355.9-301; U.C.C. Secs. 9-201, 9-301. The unperfected security interest was no more than the pre-Code contract to pledge, and therefore the line of credit was not "secured by collateral" as that term is now used in section 23A.
 
 
 36
 Policy considerations impel the same conclusion. An interpretation essentially allowing the debtor affiliate to alienate the "secured" collateral would hardly be effective protection against the dangers of insider loans. The evils of such a view are apparent in this very case. The First National Bank had already a perfected security interest in the stock; the value of the stock was no more than $500,000, or 67% of the credit line, in excess of that interest. Had Grayson Loan Company become insolvent, Bank Josephine could have recovered no more than $500,000 from the stock. More likely, the insolvency would be preceded by accumulated unpaid interest charges on the debts of the Grayson Loan Company, increasing the amount owed to Bank Josephine and decreasing the net value of the stock after First National's lien. To accept this argument would result in thwarting the congressional intent of protecting bank depositors from inadequately secured insider transactions.
 
 Fitzpatrick's Liability
 
 37
 Conceding that there were at least some statutory violations, Fitzpatrick argues that the FDIC's assessment of civil money penalties against him was arbitrary and capricious and not in accordance with applicable law. He asserts that he was not negligent in approving the loans and that his good faith efforts to correct the violations make any penalty improper. The standard of review is set out in 5 U.S.C. Sec. 706, which reads in relevant part:
 
 Sec. 706. Scope of review
 
 38
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action. The reviewing court shall--
 
 
 39
 * * *
 
 
 40
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 41
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 42
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 43
 (C) in excess of statutory jurisdiction, authority or limitations, or short of statutory right;
 
 
 44
 (D) without observance of procedure required by law; [or]
 
 
 45
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute....
 
 
 46
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 47
 See Federal Deposit Insurance Act Sec. 18(j)(3)(D), 12 U.S.C. Sec. 1828(j)(3)(D).
 
 
 48
 The assessment of penalties was under the authority of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95-630, 92 Stat. 3641. This Act has a variety of purposes, but the most prominent is combating improper insider transactions. The statute represents congressional awareness that insider abuses are a predominant cause of bank failures and can be combated only with strong protective legislation. The seriousness with which Congress regarded insider bank transactions can best be seen in the legislative history, excerpted in the footnote.[2] Congress therefore added section 22(h) to the Federal Reserve Act, restricting insider transactions, Financial Institutions Regulatory Act Sec. 104, 92 Stat. at 3644-46 (codified as amended at 12 U.S.C. Sec. 375b), and made it applicable to nonmember insured banks, Financial Institutions Regulatory Act Sec. 108, 92 Stat. at 3664 (adding Federal Deposit Insurance Act Sec. 18(j)(2), 12 U.S.C. Sec. 1828(j)(2)).
 
 
 49
 Although directors and officers may be liable to private parties for any damages resulting from violation of their duty under section 22(h), Federal Reserve Act Sec. 22(f), 12 U.S.C. Sec. 503; Federal Deposit Insurance Act Sec. 18(j)(2), 12 U.S.C. Sec. 1828(j)(2); see H.R.Rep. No. 1383, 95th Cong., 2d Sess. 11, reprinted in 1978 U.S.Code Cong. & Ad.News 9273, 9283, they also may be required to pay a civil money penalty, whether or not proven damages result, under section 108 of the Financial Institutions Regulatory Act. That section, as applicable to this issue, reads in relevant part:
 
 
 50
 (3)(A) Any nonmember insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such nonmember insured bank who violates any provision of section 371c or 375b of this title, or any lawful regulation issued pursuant thereto, shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues: Provided, That the Corporation may, in its discretion, compromise, modify, or remit any civil money penalty which is subject to imposition or has been imposed under authority of this subsection. The penalty may be assessed and collected by the Corporation by written notice. As used in this section, the term "violates" includes without any limitation any action (alone or with another or others) for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation.
 
 
 51
 92 Stat. at 3664 (adding Federal Deposit Insurance Act Sec. 18(j)(3)(A), 12 U.S.C. Sec. 1828(j)(3)(A)). While it may be argued Congress did not intend to impose a strict liability standard for violations under officers' and directors' oversight, it is clear from the explicit prohibitions of willful misconduct elsewhere in the Financial Institutions Regulatory Act that willfulness is not an essential element of the violation. See Financial Institutions Regulatory Act Sec. 602, 92 Stat. at 3686-87 (Change in Bank Control Act of 1978) (adding Federal Deposit Insurance Act Sec. 7(j)(15), 12 U.S.C. Sec. 1817(j)(15)); Financial Institutions Regulatory Act Sec. 703, 92 Stat. at 3690 (Change in Savings and Loan Control Act of 1978) (adding National Housing Act Sec. 407(q)(16), 12 U.S.C. Sec. 1730(q)(16)). Compare Financial Institutions Regulatory Act Sec. 103, 92 Stat. at 3643-44 (adding Rev.Stat. Sec. 5239(b), 12 U.S.C. Sec. 93(b)) (adding civil penalty for violations of chapter), and Financial Institutions Regulatory Act Sec. 106(a), 92 Stat. at 3647-48 (adding Bank Holding Company Act of 1956, Sec. 8(b), 12 U.S.C. Sec. 1847(b)) (adding civil penalty for violations of Act), with Rev.Stat. Sec. 5239(a), 12 U.S.C. Sec. 93(a) (existing civil penalty for knowing violations of chapter), and Bank Holding Company Act of 1956, Sec. 8(a), 12 U.S.C. Sec. 1847(a) (existing criminal penalty for willful violations of Act).
 
 
 52
 Congress intended the Financial Institutions Regulatory Act to be a re-emphasis, if not an extension, of bank directors' fiduciary duties. H.R.Rep. No. 1383, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.Code Cong. & Ad.News 9273, 9287. The requirement of board approval of large insider loans was meant to "assure that a board knows how much insiders are borrowing and that they can fulfill their fiduciary responsibility to the institution." Id. at 16, reprinted in 1978 U.S.Code Cong. & Ad.News at 9288. In effectuating congressional intent, the American Law Institute's Principles of Corporate Governance provides appropriate guidance:
 
 
 53
 Sec. 4.01. Duty of Care of Corporate Directors and Officers; The Business Judgment Rule[3]
 
 
 54
 (a) A director or officer has a duty to his corporation to perform his functions in good faith, in a manner that he reasonably believes to be in the best interests of the corporation ..., and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances.
 
 
 55
 (b) The duty of care standard set forth in Subsection (a) includes the obligation of a director or officer to make reasonable inquiry in appropriate circumstances.
 
 
 56
 (c)(1) In performing his duty and functions, a director or officer is entitled to rely on other directors or officers, employees, experts, other persons, or committees of the board in accordance with Secs. 4.02-.03. (2) The board may delegate to directors, officers, employees, experts, other persons, or committees of the board the function of identifying matters requiring the attention of the board, and a director, when acting in accordance with the standards set forth in Secs. 4.02-.03, is entitled to rely on the decisions, judgments, or performance of such persons or committees.
 
 
 57
 Principles of Corporate Governance: Analysis and Recommendations Sec. 4.01(a)-(c) (Tent.Draft No. 3, 1984).
 
 
 58
 Turning to the specific violations, we look first at the easiest case, the improper collateral for the participation loan. This loan was in fact well-secured and would easily have surpassed the current collateral requirements of section 23A(c) of the Federal Reserve Act, 12 U.S.C. Sec. 371c(c). It was a technical violation of the Act, but it did not contravene the spirit of the Act. In such a case, no more than a nominal penalty is appropriate. The FDIC, however, relied least on this violation in fixing its penalty.
 
 
 59
 As for the other case of improper collateral, the line of credit, this too is an easy case. Clearly Fitzpatrick, an experienced banker, should have known that an unperfected security interest was inadequate security. Fitzpatrick must have been aware that an unperfected security interest, worth no more than $500,000, in stock subject to a prior security interest, could not be adequate collateral for a $750,000 line of credit. The market value of Bank Josephine's interest in the collateral was considerably less than 120% of the line of credit, and that fact is stated in the board's minutes. Even if Fitzpatrick's misinterpretation of section 23A was in good faith, he remains in egregious violation of his duty of care.
 
 
 60
 Fitzpatrick argues, however, that as to the violations of the lending limits, he reasonably relied on the McGuires' representations that the two loans were to different persons. It was on these violations that the FDIC put the greatest weight.
 
 
 61
 Both loans were approved by the board of directors based on oral representations of the McGuires. While it is true that there is no "invariable presumption of rascality as to one's agents in business transactions," Briggs v. Spaulding, 141 U.S. 132, 162, 11 S.Ct. 924, 934, 35 L.Ed.2d 662 (1891), that does not mean that an officer or director should not inquire further when insider transactions are being considered by the board. The director's duty of inquiry cannot be met by representations of propriety from interested parties; he must be personally satisfied that there was an adequate independent investigation showing the propriety of the transaction. Principles of Corporate Governance: Analysis and Recommendations Secs. 4.01(a)-(c), 4.02 (Tent.Draft No. 3, 1984);[4] Corporate Director's Guidebook, 33 Bus.Law. 1591, 1602 (1978). Fitzpatrick knew well that all three McGuires had substantially the same interests, and he cannot be heard now to claim that no alert director would have immediately associated the two transactions.
 
 
 62
 Fitzpatrick also argues that his good faith efforts to invoke FDIC enforcement and to obtain correction of the insider transactions render his penalty arbitrary and capricious. The Financial Institutions Regulatory Act provides that
 
 
 63
 [i]n determining the amount of the penalty the Corporation shall take into account the appropriateness of the penalty with respect to the size of financial resources and good faith of the member bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require.
 
 
 64
 Financial Institutions Regulatory Act Sec. 108, 92 Stat. at 3664 (adding Federal Deposit Insurance Act Sec. 18(j)(3)(B), 12 U.S.C. Sec. 1828(j)(3)(B)).
 
 
 65
 It is clear from the statute that good faith goes only to the amount of the penalty, not, as Fitzpatrick argues, to its presence or absence. That being the case, we cannot agree that after-the-fact good faith renders the amount of this penalty arbitrary and capricious. In approving loans forbidden by the statute, Fitzpatrick breached his legal and fiduciary duty as an officer and director of Bank Josephine and possibly endangered his bank and the local economic community. The amount of the penalty actually imposed, considering Fitzpatrick's financial resources and the gravity of the violations, was only a token amount; Fitzpatrick's legal fees on appeal will far exceed the penalty. Such a modest penalty could have only moral force, leaving the bad faith wrongdoer untouched. We believe that no amount of after-the-fact good faith would have rendered this penalty arbitrary or capricious, and the FDIC might well have chosen to levy a penalty with more than moral force.
 
 
 66
 But in any case, the FDIC found that Fitzpatrick's efforts at correction were not motivated by good faith, but by his struggle for control of the bank with the McGuires. Regardless of whether we would have made this finding, it is supported by substantial evidence.
 
 
 67
 The decision of the Federal Deposit Insurance Corporation is affirmed.
 
 
 
 *
 Honorable George Edwards took senior status on January 15, 1985
 
 
 [1]
 Under floor plan financing, money is lent to a supplier of goods to purchase inventory, the loan being secured by the goods while in the dealer's possession and gradually reduced as the merchandise is sold. Black's Law Dictionary 577 (5th ed. 1979)
 
 
 [2]
 Problem banks and insider abuses have been virtually synonymous. Nothing appears more often on the fever charts of sick financial institutions than self-dealing ailments
 The first item on loan problems called to the attention of examiners in the Comptroller's Handbook on Examination Procedure is "self-dealing". The Comptroller warns his examiners:
 Self-dealing is involved in almost all serious problem bank situations. It is generally found in the form of an overextension of credit on an unsound basis to large shareowners, or their interests, who have improperly used their positions as owners to take money from the bank in the form of unjustified loans (or sometimes as fees, salaries, or payments for goods or service). Active officers who hold their positions at the pleasure of the board and shareowners are subject to influence and therefore are not usually in a position to evaluate and reject these credits on the same basis as the credit requests of other bank customers. In a situation of this nature, active management will often vigorously defend the unsound loans or other self-dealing practices perpetrated upon the bank by the owners.
 Your committee's bill provides a reasonable response to the problems associated with insider abuses of financial institutions and to the recognition that insiders have a special duty with respect to their institutions. Specifically, the bill places restrictions on insider loans from their banks and from their bank's correspondent banks; regulates interlocking directorships; and provides statutory language spelling out the board of directors' responsibilities with respect to insider loans. The bank regulatory agencies have requested limits on insider loans to help them curb the practices which have led to serious banking problems.
 A. Loans To Insiders From Their Own Banks
 Under current law, few restrictions exist on insider loans. This has created a banking system in which an insider or group of insiders, if they want to use their institution's funds for their own purposes, rather than providing services for a wider community, can borrow almost unlimited amounts of funds on terms and conditions which other nonaffiliated individuals may not be able to secure. Not only can this create discriminatory anticompetitive lending policies, but it has been the leading factor in bank failures.
 ....
 Viewing the overall banking situation, the Federal Deposit Insurance Corporation's study on bank failures between 1960 and 1975 demonstrated that insider loans were the principal cause of almost 60 percent of those failures. A review of the summaries of formal agreements or cease-and-desist orders by bank supervisors against banks over the last 5 years indicates that insider abuses are a significant factor leading to the imposition of such agreements and orders. Discussions of problem bank lists also provide evidence that insider self-dealing is a major reason for the deterioration of a bank's condition.
 Evidence from failed bank investigations and the 1977 FDIC survey of banking practices indicate that not only is the volume of insider lending a problem but also the granting of preferential terms and conditions on these loans. Interest rates below that charged other customers of the bank, liberal repayment terms, and the granting of loans in situations in which other customers would not be found credit-worthy, have all been documented in hearings, records, and surveys.
 H.R. 13471 would place insiders on the same level with the banking public and they would no longer be saved preferential spots in line before the loan windows.
 H.R.Rep. No. 1383, 95th Cong., 2d Sess. 10-12, reprinted in 1978 U.S.Code Cong. & Ad.News 9273, 9282-84.
 
 
 [3]
 Although section 4.01(d) of the Principles of Corporate Governance states the protective business judgment rule, we note that the business judgment rule has no application in determining responsibility for violations of law. See Miller v. AT & T, 507 F.2d 759, 762 (3d Cir.1974)
 Subsequent to oral argument, the American Law Institute again revised its Principles of Corporate Governance in a fourth tentative draft, dated April 12, 1985, and tentatively approved at the annual meeting held on May 14-17, 1985. See Principles of Corporate Governance: Analysis and Recommendations Secs. 4.01, 4.02 (Tent. Draft No. 4, 1985). This draft is not substantively different from sections 4.01 and 4.02 as quoted herein, although there are differences in wording and in the numbering of subsections.
 
 
 [4]
 Section 4.02 of the Principles of Corporate Governance sets out in perhaps unnecessary detail the rule that directors and officers are entitled to rely on corporate agents for information:
 Sec. 4.02 Reliance on Directors, Officers, Employees, Experts, and Other Persons
 In performing his duty and functions, a director or officer is entitled to rely on information, opinions, reports, statements (including financial statements and other financial data), or decisions, judgments, or performance within the scope of Sec. 4.01(c)(2), in each case prepared, presented, made, or performed by:
 (a) One or more directors, officers, or employees of the corporation, or a business organization under common control, whom the director or officer reasonably believes to be competent as to the matters presented; or
 (b) Legal counsel, public accountants, engineers, or other persons as to matters the director or officer reasonably believes are within the person's professional or other competence.
 A director or officer is not, however, entitled to rely on such information, opinions, reports, statements, decisions, judgments, or performance if his reliance is not in good faith or if he knows or, using the reasonable care required by Sec. 4.01, should know that such reliance is unwarranted.
 Our holding amounts to a determination that exclusive reliance on an interested representation is unwarranted.