Daniel M. BURKE, M. Joseph Burke, John P. Burke, John A. Edmiston, and Don C. Davis, Petitioners,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 90–9509.

United States Court of Appeals, Tenth Circuit.

July 31, 1991.

**1362**

Robert M. Vinton, Vinton, Slivka & Panasci, Denver, Colo., and Don C. Davis, pro se (Richard P. Slivka and Scott M. Tarbox, Vinton, Slivka & Panasci, Denver, Colo., and John A. Edmiston, pro se, with him on the briefs), for petitioners.

Douglas B. Jordan (Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C.; James V. Mattingly, Jr., Gen. Counsel; and Richard M. Ashton, Associate Gen. Counsel, with him on the briefs), Senior Atty., Bd. of Governors of the Federal Reserve System, for the respondent. Ann Marie Kohlligian, of counsel.

Before TACHA and SETH, Circuit Judges, and BRATTON, District Judge.*

TACHA, Circuit Judge.

Petitioners-appellants Daniel Burke, Joseph Burke, John Burke, John Edmiston, and pro se appellant Don Davis appeal a final decision of the Board of Governors of the Federal Reserve System (the Board) imposing civil money penalties pursuant to section 8(i)(2) of the Federal Deposit Insurance Act (FDI Act), 12 U.S.C. § 1818(i)(2), and section 8(b)(1) of the Bank Holding Company Act of 1956, 12 U.S.C. § 1847(b)(1).[1] The civil money penalties are based on noncompliance with four cease and desist orders (C & Ds) issued by the Board against the petitioners in their individual and official capacities. On appeal, the petitioners argue: (1) the agency violated proper procedure and due process by denying the petitioners' request for severance, failing to recognize the petitioners' compliance with the C & Ds, and assessing civil money penalties; (2) the agency's action subjected them to double jeopardy; (3) the agency violated due process by denying the petitioners' right to testify and assert their fifth amendment privilege; and (4) the agency engaged in improper ex parte communications. Davis also asserts agency officials violated federal law by obtaining and sharing documents relating to his bank account. We exercise jurisdiction under 12 U.S.C. §§ 504(d) and 1818(h)(2) and affirm.

## I. Background

During the 1980s, the petitioners were involved as directors, officers, and shareholders in several Wyoming financial institutions: EVCO, Inc. (EVCO) and Stockgrowers State Bank Company (SSBC), bank holding companies; Stockgrowers State Bank (SSB), a wholly owned subsidiary of SSBC; Guarantee Federal Bank (GFB), a federal savings bank; and Wyoming Financial Services (WFS), an umbrella company organized to market banking services.

From 1983 to mid-1984, these financial institutions engaged in unsafe and unsound insider transactions and business practices. The acquisition funding of EVCO was obtained from SSB and GFB, and some of those funds were diverted to Davis and his business associate, Robert Anderson. EVCO and SSBC issued subordinated debentures of $7,500,000 to GFB and preferred stock of $500,000 to "Powder River", a subsidiary of GFS, resulting in 33.6% and 53.7% equity investments in EVCO and SSBC respectively. The holding companies also transferred $475,000 each to WFS in exchange for options to acquire fifty percent of the outstanding shares of WFS stock. EVCO and SSBC entered into "management consulting contracts" with WFS that required payment of $300,000 a year. SSBC paid Davis and Anderson quarterly consulting fees of $4,500 without a written contract or any other documents showing services performed. Finally, both bank holding companies paid the Burkes and Edmiston directors' fees regardless of their attendance at directors' meetings.

In June 1985, the Federal Reserve Bank of Kansas City (Reserve Bank) issued four C & Ds designed to correct the financial affairs of EVCO and SSBC. Two C & Ds are applicable to EVCO and SSBC. An individual C & D relating to EVCO is binding on Edmiston, Daniel Burke, Joseph Burke, and John Burke and another relating to SSBC is binding on Daniel Burke, Joseph Burke, Davis, and Edmiston. The EVCO and SSBC C & Ds require the petitioners to submit plans for divestment of investment options in WFS by August 15, 1985 and to divest by September 30, 1985. The EVCO C & D prohibits any increases in EVCO debt without prior written approval, and the SSBC C & D prohibits payment of the expenses of any insider without prior

---

* Howard C. Bratton, Senior District Judge of the United States District Court for the District of New Mexico, sitting by designation.

1. The FDI Act has been overhauled by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). Section 907(1) of FIRREA, however, states that amendments relating to imposition of civil money penalties are effective only with respect to violations committed after the date of enactment. Accordingly, the civil money penalty provisions effective prior to FIRREA's enactment apply in this case.

written approval. The individual C & Ds include the following provisions describing the petitioners' obligation to submit and comply with plans regarding reimbursement:

> 2. By August 15, 1985 [the petitioners] shall ["jointly"—SSBC] submit a written plan to the Reserve Bank to reimburse or repay [EVCO or SSBC respectively] by September 30, 1985 for the following [enumerated amounts];
>
> 3. The Reserve Bank may comment on each plan within 30 days of receipt. [The petitioners] shall make all changes in the plans required by the Reserve Bank within 15 days of receipt of Reserve Bank's comments, and [the petitioners] shall then fully comply with the approved plans.

During the course of the agency's investigation of the petitioners' business affairs, the Reserve Bank requested information relating to Davis' personal banking transactions from other state and federal agencies.

The first proposal for reimbursement the petitioners submitted on August 23, 1985 planned to use proceeds from a "multimillion dollar loan" to purchase the WFS option from EVCO and fund the petitioners' reimbursement of EVCO. The Reserve Bank rejected that submission as inadequate. The Reserve Bank rejected the second proposal submitted two months later because it contained insufficient information to determine financial feasibility. The third proposal submitted in September 1986 concerned only partial reimbursement of EVCO and proposed transactions that potentially violated affiliate lending restrictions of the Federal Reserve Act, 12 U.S.C. §§ 371c to 371c–1. The petitioners never completed the 1986 proposal and did not submit alternative proposals.

In August 1987, the Board sought civil money penalties for the petitioners' failure to comply with the C & Ds. A pre-hearing conference was held by an administrative law judge (ALJ), during which Edmiston requested a separate hearing. At that time the Burkes stated they had no preference regarding severance. The ALJ denied Edmiston's request, explaining the actions derived from the "same web of related facts, transactions, individuals, and institutions." Later during the administrative hearing, the Burkes moved for severance. The ALJ also denied this request.

At the administrative hearing, the petitioners were given an opportunity to testify. The petitioners requested a ruling by the ALJ that cross-examination of them would be limited to issues raised in direct examination. The ALJ refused to make such a ruling because the petitioners had not been restricted in the cross-examination of the Board's witnesses. Without the protection of such a ruling, Daniel Burke and Davis declined to take the stand.

After considering all the evidence, the ALJ ruled the petitioners had not complied with the C & Ds. Civil money penalties of $600,000 were assessed against each petitioner. These amounts were reduced from the proposed penalties of $1,568,728 against Daniel and Joseph Burke and Edmiston, $936,514 against John Burke, and $736,713 against Davis. Penalties of $10,000 and $5,000 were assessed against two other defendants, James Sperry and Lyle Lake, who are not parties to this appeal. While the Board was reviewing the ALJ's findings, counsel from the agency's legal division issued a legal memorandum to the Board. Although the memorandum was made available to the petitioners, much of it was redacted on grounds of attorney client privilege. The Board reviewed the administrative record and adopted the ALJ's recommended decision and findings of fact and law.

While the Reserve Bank was seeking civil remedies, federal regulators also were considering criminal charges against the petitioners. The Reserve Bank did not discuss with the petitioners the fact the agency already had made criminal referrals on some of them. These criminal referrals ultimately led to a twenty-one count criminal indictment against the petitioners, a guilty plea to one felony count by Edmiston, and convictions on eleven and fourteen counts for Daniel Burke and Davis

respectively. The criminal convictions are currently on appeal before this court.

## II. Discussion

### A. *Assessing Civil Money Penalties in a Consolidated Hearing*

#### 1. Standard of Review

■ Our review of the Board's assessment of civil money damages is governed by section 706 of the Administrative Procedure Act (APA). In reviewing this action, we are limited to determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports its factual determinations, and whether its action was an abuse of discretion. 5 U.S.C. § 706(2)(A), (2)(D), (2)(E); *Markair v. Civil Aeronautics Bd.*, 744 F.2d 1383, 1385 (9th Cir.1984).

#### 2. Severance

■ The petitioners argue the ALJ abused his discretion by refusing to sever their hearing. The procedural regulations governing the conduct of administrative hearings do not specifically address severance. However, the regulations provide that failure to file exceptions to the rulings of the ALJ within fifteen days of serving the recommended decision and findings waives an objection. 12 C.F.R. § 263.12(b) (1991). An objection not raised with the agency within the time limits is precluded from appellate review except in exceptional cases when injustice will result. *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Director, Office of Worker's Compensation Programs v. Quarto Mining Co.*, 901 F.2d 532, 536 (6th Cir.1990); *American Maritime Ass'n v. United States*, 766 F.2d 545, 566 n. 30 (D.C.Cir.1985).

The record shows Edmiston proposed severance of the petitioners at a pre-hearing conference, and the ALJ denied that request. At the hearing the Burkes requested severance, which also was denied. The petitioners did not raise an exception to the ALJ's ruling on severance before the Board within the time limits specified by the regulations.

The petitioners assert the failure to sever resulted in an unfair hearing because the ALJ was confused by the complexity of the case. The record, however, does not support this allegation. The ALJ made detailed references to the activities of each petitioner in the recommended decision and findings. He found their relative culpabilities equivalent and imposed equivalent penalties. In this record, we cannot read anything more into his statement that it was "impossible to distinguish" among the petitioners in determining their relative culpability. Because the petitioners have not shown the denial of severance resulted in prejudice, the refusal to sever is precluded from appellate review.

#### 3. C & D Compliance

■ The petitioners contend they complied with the C & Ds and should not be subject to civil money penalties. The FDI Act provides that "any officer, director, ... or other person participating in the conduct of affairs of" an insured institution who violated the terms of a C & D issued by a federal banking agency "shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues." 12 U.S.C. § 1818(i)(2)(i). To assess a penalty, the agency only must establish an individual's violation of an agency order. *Fitzpatrick v. FDIC*, 765 F.2d 569, 578 (6th Cir.1985).

■ The ALJ found the petitioners failed to submit a viable plan to reimburse EVCO and SSBC and failed to divest those companies' investment options. There is substantial evidence in the record supporting these findings. The petitioners submitted the first plan for compliance with the C & Ds on August 23, 1985, over a week later than the C & D deadline, and this plan was rejected by the Board. They submitted another plan to the Board in October 1985 that also was rejected. A third plan was submitted in October 1986. Because that plan was not submitted in complete form, it did not receive the Board's approval. The petitioners failed to submit timely plans as

contemplated by the C & Ds. They did not make the required reimbursements, divestitures, and compliance reports. Additionally, the record shows the petitioners violated the EVCO C & D by increasing EVCO's outstanding debt, violated the SSBC C & D by paying Edmiston's travel expenses in 1986, and violated the individual C & Ds by failing to submit individual quarterly compliance reports.

The petitioners argue they complied with the C & Ds by submitting the proposals and that any failure to further comply resulted from delay in response, lack of guidance, and bad faith on the part of the Reserve Bank. The language of the C & Ds, however, supports the Board's conclusion that responsibility for failure to comply rests entirely on the petitioners. The duties of the petitioners to submit plans by August 15, 1985 and to reimburse and divest by September 30, 1985 are mandatory. The discussion regarding Reserve Bank comment and approval, however, is discretionary. Nothing in the C & Ds or the record demonstrates the petitioners' duty to comply hinges on agency action.

■ The petitioners also argue any noncompliance with the C & Ds should be excused because the agency fraudulently induced their consent to the C & Ds based on the petitioners' understanding that criminal charges against them would not be pursued. The record shows no discussion between the petitioners and the Board regarding criminal referral for the petitioners' conduct. The Board's statement that the agency's intention in seeking the orders was "remedial" and "not punitive" does not amount to fraudulent misrepresentation by the Board. This statement refers only to the C & Ds and could not reasonably be construed to be a broader grant of immunity from criminal prosecution.

■ Finally, Davis suggested for the first time in oral argument that because he did not sign the SSBC C & D, he is not required to comply. Davis failed to raise this objection with the Board during the fifteen day time period, and therefore waived it. Even if Davis' objection were not waived, it is without merit. The SSBC C & D named Davis as a director and was signed by Edmiston, a corporate officer. Moreover, Davis concedes and the record shows he had notice of the terms of that C & D. Davis was therefore responsible in his capacity as an officer of SSBC for compliance with this C & D.

### 4. The Penalty Amounts

■ The petitioners also contend the Board's assessment of civil money penalties constitutes an abuse of discretion because the amount exceeds what is necessary to force compliance. The FDI Act identifies factors the agency must take into account in determining the amount of any civil money penalty, including: (1) the financial resources of the person charged, (2) the presence of good faith, (3) the gravity of the violation, (4) the history of violations, and (5) other matters as justice requires. 12 U.S.C. § 1818(i)(2)(ii); *see also* 12 C.F.R. § 263.25 (1991).

Here, the ALJ found the violations were intentional and displayed lack of good faith. Not only did the petitioners fail to cooperate with the Board early in the process, but they also proffered "incomplete and unrealistic" plans motivated by their desire to avoid individual, out-of-pocket expenses. The ALJ also found the violations extended over a long period of time and constituted unsafe and unsound practices in breach of the petitioners' fiduciary duties. The petitioners' failure to comply with the restitution orders harmed the holding companies—ultimately causing the demise of EVCO and SSBC—while personally benefiting the petitioners.

Against these factors, the ALJ weighed the petitioners' financial resources, concluding the petitioners' assertions of negative net worth were not supported by evidence. The ALJ did take into account the petitioners' financial setbacks by recommending amounts considerably reduced from the initial assessments. We cannot say the Board abused its discretion in imposing these penalties.

## B. *Double Jeopardy*

The petitioners contend the imposition of civil money penalties constitutes double jeopardy because they already have been subjected to criminal punishment for the same conduct and the penalties are punitive in nature. We review de novo claims alleging constitutional abuse by an agency. 5 U.S.C. § 706(2)(E); *see also Sewak v. INS*, 900 F.2d 667, 671 (3d Cir.1990) (judicial review of due process violation by agency is plenary).

The double jeopardy clause of the Constitution protects against multiple punishments for the same offense. *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). In determining whether the same offense is involved, "the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). If the same offense results in criminal punishment and civil money penalties, multiple punishments exist for purposes of double jeopardy where "a civil penalty [is] so extreme and so divorced from the Government's damages and expenses as to constitute punishment." *Halper*, 490 U.S. at 442, 109 S.Ct. at 1898.

Here, criminal punishment was imposed for conspiracy, wire fraud, willful misapplication of funds of a federally insured financial institution, false entries with intent to defraud, false statements in loan applications, and false statements to a government agency that occurred from October 1982 until June 1985. Civil money penalties were imposed for noncompliance with terms of the four C & D orders, including: (1) failing to submit timely plans to the Reserve Bank, (2) increasing EVCO debt, (3) paying insider expenses in excess of $3,000, and (4) failing to submit quarterly compliance reports detailing C & D compliance actions. Violation of the C & Ds took place from August 1985 until sometime in 1986.

Proof of violation of the terms of the C & Ds does not involve proof of the same facts involved in proving the criminal violations because violation of the C & Ds implicates different conduct at different times. Therefore, criminal punishment and civil money penalties were not imposed for the same offense. Because the same conduct was not involved, we do not reach the second prong of the petitioners' argument regarding the allegedly punitive nature of the penalties.

## C. *Petitioners' Right to Testify*

Daniel Burke and Davis contend the ALJ violated due process by denying their right to testify and assert a fifth amendment privilege. The fifth amendment's self incrimination clause involves two distinct rights: a criminal defendant's right not to take the stand at his own trial and the privilege of any witness in a governmental proceeding not to answer specific, potentially incriminating questions. *Roach v. National Transp. Safety Bd.*, 804 F.2d 1147, 1151 (10th Cir.1986), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1732, 100 L.Ed.2d 195 (1988). In an agency hearing, an individual has a privilege not to answer questions by the agency when the answers might incriminate him in any future criminal proceeding. *See Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); *Roach*, 804 F.2d at 1151. To invoke this protection against self-incrimination in an agency hearing, a witness must take the stand, be sworn in, and assert the privilege in response to each allegedly incriminating question as it is asked. *Roach*, 804 F.2d at 1151; *United States v. Malnik*, 489 F.2d 682, 685 (5th Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974). This privilege allows an individual to decline to answer specific questions but does not generally prohibit inquiries designed to elicit incriminating answers. *Roach*, 804 F.2d at 1151 (citing *McCormick on Evidence* § 136 (3d ed. 1984)).

Daniel Burke and Davis refused to take the stand because the ALJ refused to rule their cross-examination would be limited to subjects raised in direct examination. Because the petitioners *themselves* chose not

to testify, the fifth amendment protection against *government* compulsion was not implicated. The ALJ's refusal to provide a blanket protection limiting the Board's scope of inquiry did not violate the petitioners' fifth amendment rights.

The petitioners object to the ALJ's comment he would consider striking their testimony if they were unresponsive. An ALJ has discretion to strike testimony he considers unresponsive. 12 C.F.R. § 263.6(b)(3). The petitioners cannot complain their due process rights were infringed when they decided not to testify and preserve for appeal testimony the ALJ might have ruled unresponsive.

### D. *Ex Parte Communications*

 The petitioners contend the memorandum from the agency's legal counsel to the ALJ constituted improper ex parte communications. The APA prohibits contact relating to the merits of a formal adjudicative proceeding between an "interested person outside the agency" and "any member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding." 5 U.S.C. § 557(d)(1)(A), (B). This ex parte restriction, however, does not apply to contacts within the agency. *United ed Steelworkers v. Marshall,* 647 F.2d 1189, 1213 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 3149, 69 L.Ed.2d 997 (1981). Here, the agency's legal division issued a legal memorandum to the Board. Because this memorandum constitutes contact within the agency, the ex parte restriction in the APA does not apply.

### E. *Right to Financial Privacy*

 Davis contends officials violated the Right to Financial Privacy Act (RFPA or Act), 12 U.S.C. §§ 3401 *et seq.,*[2] by obtaining documents relating to his bank transactions. RFPA prohibits government authorities from obtaining "copies of, or the information contained in the financial records of any customer from a financial institution" without customer authorization. 12 U.S.C. § 3402. Section 3401 of the Act defines "government authority" as "any agency or department of the United States, or any officer, employee, or agent thereof." *Id.* § 3401(3).

RFPA also establishes exceptions to this protection. One exception provides: "Nothing in this chapter prohibits the examination by or disclosure to any supervisory agency of financial records or information in the exercise of its supervisory, regulatory, or monetary functions with respect to a financial institution." *Id.* § 3413(b). A second exception provides that "[n]othing in this chapter prohibits any supervisory agency from exchanging examination reports or other information with another supervisory agency." *Id.* § 3412(d).

For purposes of RFPA, the Board is a "supervisory agency" with respect to bank holding companies and their subsidiaries. *Id.* § 3401(6)(E). The Office of the Comptroller of the Currency (OCC), the Federal Home Loan Bank (FHLB), and the Wyoming State Examiner (State Examiner) also are "supervisory agencies" under RFPA because they are regulators of the financial institutions involved. *Id.* § 3401(6). Here, the Board requested information about Davis from the OCC, the FHLB, and the State Examiner. Because the Board received information regarding Davis' accounts in pursuit of the agency's supervisory responsibilities from other supervisory agencies, the information about Davis' bank transactions is exempt from the privacy protection of RFPA.

We AFFIRM.

---

**2.** RFPA has been amended by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183 (1989). The provisions cited here are those in effect when the proceedings commenced.