**J.D. MILLER, Plaintiff–Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant– Appellee.**

No. 91–3023.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1991.

Decided Jan. 31, 1992.

Marc Bryan Chernenko, William E. Watson & Associates, Wellsburg, W.Va., argued (William E. Watson, on brief), for plaintiff-appellant.

Christopher Jon Bellotto, Federal Deposit Ins. Corp., Washington D.C., argued (Ann S. DuRoss, Asst. Gen. Counsel, Colleen B. Bombardier, Charles L. Cope, II, Sr. Counsel, on brief), for defendant-appellee.

Before ERVIN, Chief Judge, RUSSELL, Circuit Judge, and HEANEY, Senior Circuit Judge of the Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

ERVIN, Chief Judge:

J.D. Miller violated the Change in Bank Control Act, 12 U.S.C. § 1817(j)(1), by buying a controlling interest in a bank without giving the required 60 days' notice to the Federal Deposit Insurance Corporation ("FDIC"). The FDIC assessed a civil money penalty, and the district court granted summary judgment in the FDIC's favor, ordering Miller to pay the same amount of penalty that the FDIC had assessed. Miller asserts that the Change in Bank Control Act required the district court to hold a hearing or trial to resolve the penalty dispute. Because we find that there were no genuine issues of material fact and that Miller's penalty was properly computed, we affirm.

### I.

In March 1985, knowing that the Citizens Bank of Weirton, West Virginia ("CBW"), was experiencing financial trouble, Miller offered $50 per share to the bank's minority shareholders. Miller then bought 2,294 shares, about 18% of the bank's stock, at that price. In April, he bought a block of 4,706 shares from Theodora Rosenberg, the daughter of CBW's founder, for $110 per share. This second stock purchase gave Miller over 50% of CBW's stock. However, Miller had not notified the Federal Deposit Insurance Corporation ("FDIC") 60 days in advance of obtaining control of CBW, as required by the Change in Bank Control Act, 12 U.S.C. § 1817(j)(1). Miller, an attorney, was aware of the act's notification requirement and had fulfilled it on past occasions when he obtained control of banks. Miller later told FDIC officials that the opportunity to obtain control of CBW arose so fast that he was unable to provide the 60 days' notice or delay the purchase.

Miller claims that he was acting as the agent of Jeremy McCamic, the chairman of Wheeling National Bank ("WNB"), which was interested in taking over CBW. Previously, this court rejected Miller's agency theory and found that Miller "was acting in concert with McCamic simply for his own benefit." *Miller v. FDIC*, 906 F.2d 972, 975 (4th Cir.1990). WNB provided Miller with the money used to buy the second block of shares, in return for an $840,000 promissory note. In addition, WNB gave Miller a $300,000 check as prepayment for two promissory notes that McCamic and McCamic's brother had given Miller in connection with an unrelated stock transaction. In March 1986, Miller transferred his CBW stock to WNB, which in return cancelled Miller's $840,000 note and accrued interest.

As for the procedural background, we quote from our earlier opinion:

On February 26, 1986, the FDIC charged Miller with violating the Act by purchasing a controlling interest in the stock of CBW without providing sixty days' prior written notice of the proposed acquisition as required under 12 U.S.C. § 1817(j)(1). The FDIC sought to collect a $300,000 civil money penalty from Miller for the violation, and he was notified of the charges and given an opportunity to respond to them as provided under 12 U.S.C. § 1817(j)(16). An administrative law judge ("ALJ") conducted a formal agency hearing, concluded that Miller had willfully violated the Act, and recommended a penalty in the amount of $250,000. Thereafter, the FDIC adopted the ALJ's determination of liability, but increased the penalty to $375,640.

Prior to the administrative hearing, Miller filed a civil complaint against the FDIC in the United States District Court

for the Northern District of West Virginia seeking to obtain injunctive and declaratory relief. The district court declined to enjoin the FDIC from pursuing its enforcement action against Miller. At the conclusion of its administrative proceedings, the FDIC filed a late-maturing counterclaim against Miller in the district court pursuant to 12 U.S.C. § 1817(j)(16) to collect the $375,640 civil money penalty assessed against him. On cross-motions for summary judgment on the parties' respective claims, the district court entered summary judgment in favor of the FDIC as to Miller's liability under the Act, and as to the amount of the penalty.

*Id.* at 973. On appeal, we affirmed the summary judgment as to Miller's liability. We remanded the issue of Miller's penalty because it was unclear whether the district court had reviewed the FDIC's penalty assessment *de novo*, which the Change in Bank Control Act requires. *Id.* at 977. On remand, after the filing of additional memoranda but without a hearing, the district court stated that it had applied *de novo* review and ordered Miller to pay the $375,-640 penalty first assessed by the FDIC. Ironically, because the district court decided the penalty issue by way of summary judgment, we now must apply our own *de novo* review to the district court's *de novo* review. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988).

## II.

■ At the time of Miller's violation, once a federal banking agency had calculated a civil money penalty, the Change in Bank Control Act provided that:

The agency may collect such civil penalty by agreement with the person or by bringing an action in the appropriate United States district court, except that in any such action, the person against

whom the penalty has been assessed shall have a right to a trial de novo. 12 U.S.C. § 1817(j)(16).[1]

A threshold issue is whether it was appropriate for the district court to resolve its *de novo* review via summary judgment. Unfortunately, there is no caselaw on this point under the Change in Bank Control Act. Although the Act gives a party the right to appeal the FDIC penalty to the district court for a "trial *de novo*," requiring a trial when summary judgment is appropriate would be a senseless waste of judicial resources. Caselaw construing the Food Stamp Act, 7 U.S.C. § 2023, supports that proposition. The Food Stamp Act provides that judicial review "shall be a trial de novo by the [district] court in which the court shall determine the validity of the questioned administrative action in issue." *Id.* In affirming a grant of summary judgment under the Food Stamp Act, the Fifth Circuit stated, "Despite the trial de novo provision, it is clear that summary judgment is a proper means of disposing of requests for review ... when there are presented no genuine issues of material fact." *Modica v. United States*, 518 F.2d 374, 376 (5th Cir.1975). *Accord Freedman v. United States Dept. of Agriculture*, 926 F.2d 252, 261 (3d Cir.1991); *Bordelon v. Block*, 810 F.2d 468, 470 (5th Cir.1986); *Cullen Drive–In Grocery v. Block*, 778 F.2d 1141, 1142 (5th Cir.1985). Finding the Food Stamp Act caselaw on this point persuasive, we hold that the district court was empowered to resolve this penalty dispute via summary judgment.

## III.

■ Having held that the district court could resolve this dispute via summary judgment, this court must now review the district court's calculation of Miller's penalty, viewing any permissible inferences to be drawn from the underlying facts in the light most favorable to Miller. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

1. Congress substantially amended the Change in Bank Control Act in 1989. Congress deleted the "trial *de novo*" provision and decided that the Administrative Procedure Act, 5 U.S.C. § 706,

should govern the scope of judicial review. *See* H.R. 54–101(I), 101st Cong., 1st Sess. § 907 (1989).

475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The Change in Bank Control Act in effect during Miller's violation described the determination of penalties as follows:

> Any person who willfully violates any provision of this subsection, or any regulation or order issued by the appropriate Federal banking agency pursuant thereto, shall forfeit and pay a civil penalty of *not more than $10,000 per day* for each day during which such violation continues. The appropriate Federal banking agency shall have authority to assess such a civil penalty ... *after giving due consideration to the appropriateness of the penalty with respect to the size of financial resources and good faith of the person charged, the gravity of the violation, and any data, views, and arguments submitted.*

12 U.S.C. § 1817(j)(16) (emphasis added). To flesh out this legislative directive, the FDIC relies on an interagency policy statement that lists 13 factors to be used in determining civil money penalties. Interagency Policy, 45 Fed.Reg. 59,423 (1980). One factor is the financial benefit the person received, which is what the FDIC purported to seek here. The FDIC designed its penalty to equal Miller's profit and stated that such a penalty would also be sufficient to deter Miller from committing future violations. Joint Appendix at 22–23. The FDIC found that Miller's profit came from three sources. First, he sold the shares he acquired from minority shareholders to WNB (the "minority shares"). Next, he sold the shares he acquired from Theodora Rosenberg (the "Rosenberg shares"). Finally, Miller earned some profit when WNB paid him $300,000 for the two promissory notes the McCamics had given him. We will discuss each source of profit in turn.

First, it is undisputed that Miller purchased 2,294 shares from minority shareholders at $50 per share. In March 1986, he transferred these shares along with his other shares to WNB. WNB cancelled Miller's $840,000 promissory note and accrued interest. The value of the note and interest was $134 per share, giving Miller a profit of $84 per share. Miller argues that he received only $120 per share instead of $134. However, Miller's argument ignores the accrued interest on his promissory note. The cancellation of that interest was surely a benefit to Miller, and he has given no good reason why it should not be included in his profit.

Miller also claims that interest on a loan he took in order to buy the shares, capital he borrowed and injected into CBW, and interest he paid on that capital all reduce the profit he received, leaving him a profit of only $22,871.18. The FDIC responds that Miller's capital injection was not associated with the purchase of the stock but was instead made to protect Miller's investment, and that there is no legal basis for Miller to deduct any of these expenses. This dispute is not over the facts but is instead over their legal effect. We agree with the FDIC as to Miller's extra expenses. By way of analogy, if a taxpayer uses borrowed money to buy XYZ stock and later sells the stock at a profit, the taxpayer cannot deduct from his capital gains the interest he paid to borrow the money. Here, finding no genuine issue of material fact, and subtracting $7,000 in expenses that are not in dispute, we hold that Miller's profit on the minority shares was $185,696.[2]

Second, for the Rosenberg shares, Miller gave Rosenberg a cashier's check for $470,600 and received 4,706 shares from her, which equals $100 per share. On the same day, Miller bought a $94,120 repurchase agreement and gave Rosenberg the right to one-half that amount, or $47,060, which equals $10 per share. In all, then, Miller paid Rosenberg $110 per share. As with the minority shares, Miller later sold the Rosenberg shares for $134 each, which gave Miller a profit of $24 per share. Miller argues that he made no profit on the Rosenberg shares, because he bought and

---

**2.** $84 profit per share × 2,294 shares = $192,696 gross profit − $7,000 expenses = $185,696 net profit.

sold them at the same price, $120 per share. This argument ignores two things. First, as discussed above, Miller's sale price should include the accrued interest on Miller's $840,000 promissory note that was cancelled, which gives a total of $134 per share. Second, Miller does not counter the FDIC's evidence of what he paid Rosenberg, which clearly adds up to $110 per share. Again finding no issue of material fact, we hold that Miller's profit on the Rosenberg shares was $112,944.[3]

■ Third, McCamic, the chairman of WNB, and his brother each gave Miller a $100,000 promissory note in April 1981. The two notes were to mature in April 1991. The notes earned simple interest at 12% per year. When Miller agreed to purchase the Rosenberg shares, in April 1985, the McCamics in return prepaid the promissory notes. They gave Miller $300,000. The FDIC determined that the notes at that time were worth $223,000, using a standard discount rate. In other words, the market value of the notes in April 1985 was $223,000, not $300,000. If the notes had been due in April 1985 and had been earning the same rate of interest, then they would have been worth about $300,000, but they were not due until April 1991. It is proper to use the market value of the notes, especially because the McCamics were sophisticated businessmen who were likely to have known what the notes were worth. Subtracting the market value, $223,000, from the $300,000 Miller received leaves a profit of $77,000.

■ Miller does not question the market value of the notes but claims that the payment of the promissory notes was unrelated to his obtaining CBW stock. However, the McCamics arranged to prepay the promissory notes at the same meeting where Miller agreed to obtain CBW stock and sell it to WNB. The payment was obviously part of Miller's compensation for the stock deal with WNB. The facts support no other conclusion. Alternatively, Miller claims that this conclusion is "inconsistent," because finding that WNB used bank funds to pay the McCamics' personal debts is "tantamount to a finding that Wheeling National Bank breached its corporate fiduciary duty." Reply Brief for Appellant at 8. However, there is nothing "inconsistent" about the district court's conclusion. To the contrary, the district court's conclusion is perfectly consistent with the facts. The question of Miller's profit from the stock sale to WNB, not the McCamics' breach of fiduciary duty, was before the district court. That the McCamics apparently acted improperly was not relevant to the determination of Miller's penalty. We hold that the district court correctly concluded that Miller's $77,000 profit on the promissory notes was compensation for the transfer of CBW stock to WNB. Added to the two other sources of profit, Miller's total profit was $375,640.

■ Miller argues that the district court was required to conduct a hearing to examine thoroughly all of the factors listed in the interagency policy statement on the determination of civil money penalties. Interagency Policy, 45 Fed.Reg. 59,423 (1980). Miller asserts that such a hearing would have led to a reduction in his penalty. However, the interagency policy statement that Miller relies on states:

> In determining the amount of a civil money penalty, the agencies believe that a significant consideration should be the financial or economic benefit the respondent obtained from the violation. Accordingly, the agencies will consider, in addition to the other factors specified in the statute, the financial or economic benefit the respondent derived from the illegal activity. The removal of economic benefit will, however, usually be insufficient by itself to promote compliance with the statutory provisions. The penalty may, therefore, in appropriate circumstances reflect some additional amount beyond the economic benefit derived to provide a deterrent to future conduct.

*Id.* The policy statement thus does not support Miller's position, for it clearly states that financial benefit is the starting

---

**3.** $24 profit per share × 4,706 shares = $112,944.

point in determining a penalty and that the other factors may *increase* the penalty. In this case, the FDIC's penalty equalled the financial benefit, or profit, that Miller made on the CBW stock transactions. While the agency stated that some of the other factors (willfulness, lack of good faith, length of the violation, and ability to pay) also justified a larger penalty, it did not use them to fine Miller beyond the profit he made. Because the statute at the time authorized a penalty of up to $10,000 per day and Miller was in violation for over 10 months, the FDIC conceivably could have imposed a penalty exceeding $3,000,000. Instead, the FDIC came up with a precise calculation of Miller's profit and penalized him that amount.

The district court reviewed the entire record, agreed with the calculation of Miller's penalty, and stated that the factors of willfulness, lack of good faith, and length of violation justified the size of the penalty. In his briefs and oral argument to this court, Miller has not given any indication of how applying the additional factors would have affected his penalty. We cannot conceive how an in-court examination of the additional factors could have led to any change in Miller's penalty, except perhaps for an increase.

In sum, having viewed the evidence in the light most favorable to Miller, we find that the district court's calculation of Miller's penalty was correct. We find no merit in Miller's final argument, a claim of selective prosecution. Accordingly, the judgment of the district court is hereby

AFFIRMED.