# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J.  Fisher, Jr.                                    Elisabeth A. Shumaker
Clerk                                                      Chief Deputy Clerk

July 2, 1997

**TO:**   All recipients of the captioned opinion

**RE:**   96-9526, Long v. Board of Governors
          June 30, 1997

Please be advised of the following correction to the captioned decision:

In the attorney designation section on the first page, "Civiletti" (in the name of the firm representing Petitioner) is incorrectly spelled "Civilett."  Please make the correction.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

JUN 30 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

W.C. LONG, Jr.,

      Petitioner,

v.

     No. 96-9526

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

      Respondent.

**Appeal from the Board of Governors of the Federal Reserve System
(Agency No. 91-027)**

Kenneth C. Bass III (Ronald R. Glancz and Juliana Schulte O'Reilly with him on
the briefs) of Venable, Baetjer, Howard & Civiletti, LLP, Washington, D.C., for
Petitioner.

Douglas B. Jordan (James V. Mattingly, Jr., General Counsel; Richard M. Ashton,
Associate General Counsel; Katherine H. Wheatley, Associate General Counsel,
with him on the brief), Washington, D.C., for Respondent.

Before **PORFILIO, ANDERSON** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Appellant W.C. Long, Jr. appeals the entry of a $717,941 civil penalty entered against him by the Board of Governors of the Federal Reserve System ("the Board"). We exercise jurisdiction over Mr. Long's appeal pursuant to 12 U.S.C. §§ 1818(h)(2) and 1848 (1994), and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Long has been engaged in the business of banking since 1955. In 1978, Mr. Long purchased all the stock of Sumner County Bancshares, Inc. ("Sumner County"), which owned 90.5 percent of the stock of the Bank of Commerce and Trust Company ("Bank of Commerce"). In 1984, Mr. Long purchased over ninety-nine percent of the stock of Cedar Vale Bank Holding Company ("Cedar Vale"), which owned Cedar Vale State Bank. Mr. Long financed the acquisition with bank financing ("the Debt"); Cedar Vale was the principal obligor on the Debt, while Sumner County and Mr. Long personally guaranteed the Debt. From 1985 to 1989, Mr. Long serviced the Debt using personal funds, including dividends paid to him by Sumner County.

The Cedar Vale State Bank experienced financial difficulties and was closed by Kansas bank regulators in January 1988. At this point, Cedar Vale ceased to own a bank and, consequently, was no longer a bank holding company

within the meaning of the Bank Holding Company Act.[1]  The closure of Cedar

Vale State Bank left Cedar Vale a debt with the principal amount of

approximately $904,000, and no source of income with which to service the Debt.

In 1989, at the request of the lender, Mr. Long changed his status from guarantor

to co-maker of the Debt.

Due to substantial losses prior to the closing of Cedar Vale State Bank,

Cedar Vale had accumulated approximately $1.3 million in net operating loss

carry-overs.  Net operating loss carry-overs can be used to offset taxable income

and reduce corporate income tax liability.  *See* 26 U.S.C. § 172 (1994 & Supp.

1997).  Because Cedar Vale no longer had any income, however, it was unable to

use its net operating loss carry-overs.

As early as 1988, Mr. Long sought a means of creating an entity that could

make use of the net operating loss carry-overs and service the Debt.  In January

1989, Mr. Long began a series of contacts with the Federal Reserve Bank of

Kansas City concerning a possible merger between Cedar Vale and Sumner

County.  Mr. Long advised the Federal Reserve Bank the proposed merger would

---

[1]  A bank holding company is any company that has control over any bank
or over any company that is or becomes a bank holding company.  12 U.S.C.
§ 1841(a)(1) (1994).

allow Sumner County to assume the Debt and it would generate more than $400,000 in tax savings. In June 1989, Mr. Long filed an application with the Federal Reserve Bank for Cedar Vale to acquire and merge with Sumner County. In a letter to Mr. Long, the Federal Reserve Bank requested more information from Mr. Long but informed him Cedar Vale's high level of debt and the Bank of Commerce's financial condition made approval of the merger "highly unlikely."

Thereafter, in August 1989, Mr. Long's son, attorney James J. Long, filed an application for Board approval for Cedar Vale to become a bank holding company by acquiring 90.5 percent of the stock of the Bank of Commerce. The Federal Reserve Bank informed Mr. Long by letter the chances for Board approval were "poor" because the application raised the same financial concerns as the earlier merger application. Nevertheless, the Board agreed to accept the application for processing.

In a letter dated October 23, 1989, the Federal Reserve Bank informed Mr. Long his application had been forwarded to the Board of Governors' staff and would be processed according to a sixty-calendar-day schedule. The letter stated "a decision regarding your application will be forthcoming on or before December 22, 1989, unless you are notified to the contrary." Throughout the fall of 1989,

Federal Reserve Bank staff continued to communicate with Mr. Long and James Long regarding the application.

On December 28, 1989, having received no decision on his application, Mr. Long held special meetings of the shareholders and directors of Cedar Vale and Sumner County. At the meetings, resolutions approving the merger of Sumner County into Cedar Vale were unanimously ratified. The following day, Mr. Long received an undated letter from the Federal Reserve Bank, postmarked December 26, 1989, informing him the Board needed an additional period of time to evaluate his application. The letter stated the Board would act within the ninety-one-day period provided in sections 225.14(g) and 225.23(h) of Regulation Y.

Upon receipt of the letter, Mr. Long instructed James Long to call and advise the Board he believed the application had been approved by operation of law by virtue of the Board's failure to act within the sixty-day deadline. Board staff told James Long the application had not been deemed approved and the proposed transaction should not be consummated. Board staff explained the Board regarded the sixty-day time period as an internal processing period and an application is only granted by operation of law if the Board fails to act within

ninety-one days of a complete application.[2]  Following James Long's conversation with Board staff, James Long told Mr. Long he had a "disagreement with ... the Board decision or the sixty day position on the letter."

On January 3, 1990, while his application was still pending with the Board, Mr. Long transferred 100 percent of his shares of Sumner County to Cedar Vale.[3] Mr. Long did not inform the Board or Federal Reserve Bank he had transferred his Sumner County shares.  Rather, he continued to correspond with both staffs with respect to their requests for additional information needed for consideration of his application.  In fact, on January 24, 1990, James Long wrote a letter to Board staff indicating no transaction had taken place.  In response to this letter, Board staff advised James Long the application had not yet been approved and Cedar Vale should refrain from consummating the transaction because "[c]onsummation of [the transaction without Board approval] would constitute a violation of the [Bank Holding Company] Act and would be subject to possible civil or criminal penalties."

---

[2]  Under 12 U.S.C. § 1842(b)(1) (1994), an application shall be deemed to have been granted if the Board fails to act on any application "within the ninety-one-day period which begins on the date of submission to the Board of the complete record on that application."

[3]  The transaction was essentially the merger sought in the June 1989 application, rather than the acquisition sought in the August 1989 application.

On February 9, 1990, the Board issued an order denying Cedar Vale's application to become a bank holding company and acquire 90.5 percent of the shares of Commerce Bank. *The Cedar Vale Bank Holding Company*, 76 Federal Reserve Bulletin 257 (1990). The Board determined "Cedar Vale would not have sufficient financial flexibility to service its debt without unduly straining the resources of the proposed combined organization and Bank." The Board also considered and rejected Mr. Long's contention the application had been approved by operation of law.[4] Although Mr. Long received the Board's order, he neither reversed the transfers of stock nor informed the Board or Federal Reserve Bank the transfers had occurred.

Although Cedar Vale requested reconsideration of the Board's order, it did not challenge the Board's determination the application was not approved by operation of law. On March 9, 1990, the Board denied the request for reconsideration. Cedar Vale did not seek judicial review of the Board's decision denying the application.

---

[4] In light of the Board's receipt of information necessary to complete Cedar Vale's application as late as January 19, 1990, the Board concluded the ninety-one-day period set forth in 12 U.S.C. § 1842(b)(1) had not expired.

In May 1990, during an inspection of Sumner County, Federal Reserve Bank examiners discovered Mr. Long had transferred his shares in Sumner County to Cedar Vale. Beginning in June 1990 and on numerous occasions thereafter, the Federal Reserve Bank and Board staff informed Mr. Long the transfer violated the Bank Holding Company Act and that if the transfers were not reversed, he could face substantial penalties. Notwithstanding these warnings, Mr. Long took no actions to reverse the transfers of stock.

On February 7, 1994, the Board issued a Notice of Charges and Hearing pursuant to the Federal Deposit Insurance Act and a Notice of Assessment of Civil Money Penalties pursuant to the Bank Holding Company Act against Mr. Long and Cedar Vale.[5] The notices alleged Cedar Vale, at Mr. Long's direction, violated section 3(a)(1) of the Bank Holding Company Act and Regulation Y,[6] 12

---

[5] The Notice of Assessment of Civil Money Penalties also was issued against James Long. However, on June 12, 1995, James Long consented to the issuance of an Order of Assessment of Civil Money Penalty in settlement of the Board's proceeding against him.

[6] Section 3(a) of the Bank Holding Company Act requires prior Board approval before a company can become a bank holding company. 12 U.S.C. § 1842(a) (Supp. 1997). Section 11(a) of the Board's Regulation Y implements this statutory provision by requiring a prior application to the Board for the formation of a bank holding company. 12 C.F.R. § 225.11(a) (1996). Any company that violates, and any individual who participates in a violation of, the Bank Holding Company Act may be assessed a penalty of up to $25,000 per day for each day the violation continues. 12 U.S.C. § 1847(b)(1) (1994).

C.F.R., Part 225, by unlawfully acquiring shares of Sumner County.[7] The notices

sought a civil penalty of $300,000 from Mr. Long, a cease and desist order

prohibiting Mr. Long and Cedar Vale from future violations of law, and an order

requiring Cedar Vale and Mr. Long to reverse the unlawful acquisitions.

Following the issuance of the notices, the parties filed cross-motions for

summary disposition. The Administrative Law Judge issued a partial summary

disposition order in favor of Board Enforcement Counsel finding Cedar Vale

violated section 3 of the Bank Holding Company Act and Regulation Y by

acquiring Sumner County without Board approval.[8] The Administrative Law

Judge determined Mr. Long caused Cedar Vale's violations of the Bank Holding

Company Act and Regulation Y. Although the Administrative Law Judge

---

[7] Although not germane to this appeal, the notices also alleged Mr. Long and Cedar Vale violated section 4 of the Bank Holding Company Act and Regulation Y by acquiring control of a non-bank subsidiary, Tri-County Financial Corporation ("Tri-County"), without Board approval. Section 4 of the Bank Holding Company Act prohibits, with certain exceptions, a bank holding company from acquiring or retaining control of any company which is not a bank or which engages in nonbanking activities. 12 U.S.C. § 1843. Tri-County is an insurance corporation that was owned by Mr. Long in early 1989. In mid-1989, Mr. Long transferred 100 percent of Tri-County's stock to Cedar Vale. Thus, according to the Notice, when Cedar Vale unlawfully merged with Sumner County in January 1990 and became a bank holding company, it violated section 4 by retaining control of a non-bank subsidiary without Board approval.

[8] The Administrative Law Judge also found Cedar Vale and Mr. Long violated Section 4 of the Bank Holding Company Act by retaining control of Tri-County without Board approval.

-10-

recommended summary disposition on the cease and desist relief sought in the Notice, he found there were issues of fact regarding the assessment of a civil penalty that required a formal adjudicatory hearing.

From June 12 to 15, 1995, the Administrative Law Judge held a hearing in Wichita, Kansas on the appropriateness and amount of a penalty. Based on his finding that Mr. Long had received an economic benefit of at least $567,941 as a result of his misconduct, the Administrative Law Judge recommended a civil money penalty be assessed against Mr. Long in the amount of $717,941. $150,000 of the recommended penalty was to serve as a deterrent for future violations. The Administrative Law Judge did not recommend a reversal of the unlawful transactions because none of the original entities remained at that time.[9]

Mr. Long filed exceptions to the Recommended Decision of the Administrative Law Judge. However, on July 2, 1996, the Board issued a Final Decision adopting the Administrative Law Judge's findings that Cedar Vale had violated the Bank Holding Company Act and Mr. Long had caused those

---

[9] On January 1, 1995, Mr. Long, without Board approval, merged Cedar Vale into Tri-County, and then Tri-County and Sumner County into the Bank of Commerce. As a result, Cedar Vale, Tri-County, and Sumner County ceased to exist.

-11-

violations. The Board ordered Mr. Long to pay the recommended civil penalty of $717,941 and to cease and desist from future violations of the Bank Holding Company Act. Following the issuance of the Board's Final Decision, Mr. Long initiated this appeal.

## II. ISSUES RAISED ON APPEAL

Mr. Long raises two general issues on appeal: (1) whether the imposition of the civil penalty was arbitrary, capricious and unsupported by the record and (2) whether the Board violated the Bank Holding Company Act or Mr. Long's due process rights by imposing a penalty more than twice the amount stated in the Notice of Assessment.

## III. ANALYSIS

### A. Standard of Review

Our review of the Board's decision and imposition of civil penalties is governed by Section 706 of the Administrative Procedure Act. *Burke v. Board of Governors*, 940 F.2d 1360, 1365 (10th Cir. 1991), *cert. denied*, 504 U.S. 916 (1992). Under Section 706, the Board's action "must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional

requirements."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (quoting 5 U.S.C. §§ 706(2)(A), (B), (C), (D) (1994 ed., Supp. V)). Furthermore, we must set aside any of the Board's findings that are not supported by substantial evidence.  *Burke*, 940 F.2d at 1365; 5 U.S.C. § 706(2)(E). However, as long as there is substantial evidence to support the Board's findings, "we will not reverse even though we might reach a different result if we were making the initial decision on the matter."  *Wyoming Bancorporation v. Board of Governors*, 729 F.2d 687, 691 (10th Cir. 1984).

**B.  Was Imposition of Penalty Arbitrary, Capricious, and Unsupported by the Record?**

Mr. Long contends the Board's imposition of the $717,941 civil penalty was "unfair, arbitrary, capricious and unsupported by the record."  Specifically, Mr. Long makes the following arguments:  (1) the amount of the penalty assessed in this case as compared with the penalties assessed in prior cases "shocks the conscience"; (2) there is insufficient evidence to support the Board's conclusion Mr. Long acted in bad faith and conducted the merger in knowing and intentional violation of Board authority; (3) the "economic benefit" portion of the penalty is not supported by applicable law or substantial evidence; (4) the penalty is unreasonable and invalid under the Administrative Procedure Act; and (5) the

penalty is so excessive it is a violation of Mr. Long's rights under the Due Process Clause.[10]  We will address each of these contentions in turn.

### 1.  Comparison of penalty with previous cases

Mr. Long first appears to argue the Board erred in failing to undertake any comparison of the penalty issued in this case with the penalty issued in prior actions.  Mr. Long contends the Board has never previously imposed a penalty of this magnitude where there is no evidence of harm to the bank or its customers or of misuse of control over the bank for personal gain.  According to Mr. Long, the amount of the penalty in this case is "unprecedented" and "shocks the conscience" when compared to the penalty issued in prior cases.

Pursuant to 12 U.S.C. § 1847(b)(1), an individual who violates a provision of the Bank Holding Company Act may be assessed a "civil penalty of not more than $25,000 for each day during which such violation continues."  In determining the amount of a civil penalty, the Board shall consider:  (1) the financial

---

[10]  Mr. Long has actually raised two distinct due process arguments.  He first contends the Board's penalty is so excessive that it "run[s] afoul of the Due Process Clause."  (Apt's brief at 26.)  We analyze this contention in section III.B.5., *infra*.  Second, Mr. Long argues the Board violated his due process rights by imposing a penalty of more than twice the amount stated in the Notice of Assessment.  (*Id.* at 30-32.)  We discuss and analyze this argument in section III.C.2., *infra*.

resources and good faith of the violator; (2) the gravity of the violation; (3) the history of previous violations; and (4) such other matters as justice may require. 12 U.S.C. § 1818(i)(G) (1994); 12 C.F.R. § 263.62; *Burke*, 940 F.2d at 1366. The Board's regulations also require the Board to consider the "economic benefit derived by the person from the misconduct." 12 C.F.R. § 263.62; *see also Miller v. Federal Deposit Ins. Corp.*, 956 F.2d 58, 62-63 (4th Cir. 1992) ("financial benefit is the starting point in determining a penalty").

In assessing the civil penalty against Mr. Long, the Board considered the statutory mitigating factors set forth in 12 U.S.C. § 1818(i)(G) as well as the economic benefit Mr. Long derived from the violation. The Board determined Mr. Long acted in bad faith and the gravity of his misconduct was severe. The Board found not only had Mr. Long knowingly proceeded with the unlawful merger without Board approval, but he had attempted to conceal the transaction and had refused to reverse the transaction once it was discovered by bank examiners. Although there was no history of previous violations, the violations continued over a period of five years. The Board also found Mr. Long had obtained an economic benefit of at least $567,941 from the unlawful merger. In arriving at a total sanction of $717,941, the Board determined a $150,000 penalty was necessary to deter future violations. The Board found Mr. Long had a net

worth of more than $2.3 million and was, therefore, financially able to pay the civil penalty.

We believe the Board did an exemplary job in considering the required statutory and regulatory factors and determining an appropriate sanction. Notwithstanding Mr. Long's contentions to the contrary, the Board was under no obligation to compare the penalty in this case to those imposed by the Board in previous cases. A determination of the appropriate monetary penalty depends on the facts and circumstances of the particular case at issue, not on a comparison of penalties charged to other individuals. Indeed, the Board previously has noted it assesses penalties based on the particular facts of each case and comparisons with penalties assessed in other cases are of "little relevance." *In re CBC, Inc.*, 79 Fed. Res. Bull. 247, 248 (1993), *aff'd*, 13 F.3d 404 (10th Cir. 1993), *cert. denied*, 511 U.S. 1142 (1994). Mr. Long has cited no authority to the contrary. Thus, we conclude the Board did not err by failing to undertake a comparison of Mr. Long's penalty with penalties assessed by the Board in prior cases. Furthermore, even if the penalty assessed against Mr. Long is disproportionate to other penalties, we find it was properly entered pursuant to 12 U.S.C. §§ 1818(i)(G) and 1847(b)(1).

## 2. Bad Faith

Mr. Long contends the Board's finding Mr. Long acted in bad faith and conducted the merger in knowing and intentional violation of Board authority is not supported by evidence in the record. Mr. Long claims he believed in good faith his application had been approved by operation of law when the Board failed to notify him of its decision within the original sixty-day period. Furthermore, Mr. Long claims there is no evidence in the record to support the Board's finding that James Long "reported to his father that Board staff did not agree with their view that the transactions had been approved because the 60 day period had passed." Mr. Long contends the Board's determination of bad faith is flawed because it was premised on this specific finding.

After conducting a thorough review of the record, we conclude there is substantial evidence in the record to support the Board's finding that at the time of the unlawful transaction, Mr. Long knew the Board did not agree his application had been approved by operation of law. It is undisputed that on December 29, 1989, seven days after the original sixty-day period had expired, Mr. Long received a letter from the Board stating the Board would need an additional period of time to evaluate his application. The Board's letter did not even remotely suggest Mr. Long's application had been approved by operation of law. Upon receipt of the Board letter, Mr. Long instructed his attorney and son,

James Long, to telephone Board staff and advise them he believed the application had been approved by operation of law. During James Long's conversation with Board staff, he was explicitly advised the sixty-day time period was merely an internal processing period and the application had not been approved.

Mr. Long testified before the Administrative Law Judge that James Long informed him following his conversation with Board staff that "he had disagreement ... with the Board decision or the sixty day position on the letter." In light of the fact Mr. Long specifically directed James Long to speak with Board staff concerning whether the application had been approved by law, we believe Mr. Long's testimony that James Long informed him "he had disagreement with" Board staff is sufficient to support the Board's finding that Mr. Long knew the Board did not believe his application had been approved by operation of law. Moreover, even if there were no record evidence that James Long had advised Mr. Long of Board staff's position, James Long's knowledge of Board staff's position would be imputed to Mr. Long because James Long was acting as Mr. Long's attorney when he spoke with Board staff. *See Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 92 (1990) ("[u]nder our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney")

(quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962)) (internal quotation marks omitted). Thus, we conclude at the time Mr. Long effectuated the unlawful merger, he was aware Board staff did not believe his application had been approved by operation of law.

Furthermore, we find the record is replete with other evidence supporting the Board's finding Mr. Long acted in bad faith and in knowing and intentional violation of Board authority. As determined by the Board, Mr. Long's motivation in conducting the merger was personal gain. Mr. Long testified he transferred the shares in January 1990 in order to get the tax benefits of the transaction for the full year. Following the unlawful transaction, Mr. Long did not inform the Board he had transferred his Sumner County shares to Cedar Vale. Instead, Mr. Long continued to communicate with Board staff with respect to his application as if the transaction had not been consummated. In a January 24, 1990 letter to Board staff, James Long stated he would be advising Mr. Long to complete the transaction, thus falsely implying the merger had not yet occurred.

Following the Board's denial of Mr. Long's application in February 1990, Mr. Long did not inform the Board of the unlawful merger or reverse the transaction. Rather, the merger went undiscovered until May 1990, when bank

examiners uncovered the transaction during a routine inspection of Sumner County. Following the discovery, the Board informed Mr. Long on numerous occasions the transaction violated the Bank Holding Company Act and if it was not reversed, he could face substantial penalties. However, Mr. Long refused to undo the unlawful merger. In fact, Mr. Long allowed the merger to go uncorrected for nearly five years, until January 1, 1995, when he merged Cedar Vale into the Bank of Commerce.

We believe Mr. Long's conduct in completing the transfer for personal gain, concealing the transfer from the Board, and refusing to correct the violation for almost five years supports the Board's determination of bad faith. Moreover, Mr. Long's claim he acted in good faith is also undermined by the actual substance of the transaction he conducted on January 3, 1990. The application Mr. Long claims was approved by law sought permission for Cedar Vale to purchase 90.5% of the shares of Commerce Bank. However, the transaction Mr. Long caused to occur on January 3, 1990 was a merger between Sumner County and Cedar Vale. Thus, even if the application had been approved by operation of law, Mr. Long could only have reasonably believed he had the authority to cause Cedar Vale to purchase 90.5% of the shares of Commerce Bank; Mr. Long could not have harbored an objectively reasonable belief that he had Board approval to engage in

the January 3, 1990 merger.  Based on the foregoing evidence, we conclude the Board's determination Mr. Long acted in bad faith and in knowing and intentional violation of Board authority finds ample support in the record.

### 3.  Economic benefit portion of penalty

The $717,941 civil penalty entered against Mr. Long consists of two components. The Board imposed $150,000 of this award to serve as a penalty and to deter future noncompliance.  The Board based the remainder of the award, $567,941, on the economic benefit the Board determined Mr. Long obtained from the unlawful merger.  Mr. Long contends the "economic benefit" portion of the civil penalty is not supported by law or substantial evidence in the record.  Although not perfectly clear, we construe Mr. Long's attack on the economic benefit portion of the penalty as a two-prong attack.

First, Mr. Long appears to contend tax benefits are not economic benefits under the Board's regulations.  In determining the amount of a civil penalty to assess, the Board is required to consider the "economic benefit derived by the person from the misconduct."  12 C.F.R. § 263.62.  The Board's own policy statements provide "a significant consideration [in assessing a penalty] should be

the financial or economic benefit the respondent obtained from the violation." 45 Fed. Reg. 59423, 59424 (1980).

Although neither the regulations nor the Board's policy statements define the phrase "economic benefits," we conclude the phrase should be interpreted broadly to encompass tax benefits. If the Board had intended, as Mr. Long asserts, to limit the phrase "economic benefits" to those benefits obtained by an unlawful loan or by a bank officer's diversion of funds for his personal use, the Board certainly could have done so by means of precise limiting language. Having failed to use such language, we believe "economic benefits" should be broadly interpreted to effectuate the purposes of the civil money penalty provisions.

Congress enacted the civil money penalty provisions to provide the Board with "the flexibility it needs to secure compliance" with the Bank Holding Company Act and to "serve as deterrents to violations of laws, rules, regulations and orders of the agencies." House Report No. 95-1383 at 17, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 9273, 9289. As is obvious from the present case, tax benefits are one of the primary reasons bank holding companies are formed. *See Board of Governors v. First Lincolnwood Corp.*, 439 U.S. 234,

238 (1978). Thus, in order to effectively deter violations of the Bank Holding

Company Act, the Board must be permitted to divest illegally formed bank

holding companies of their unlawfully gained tax benefits. Otherwise, the Board

would be deprived of some of the flexibility it needs to secure compliance with

the Bank Holding Company Act. Furthermore, if the Board were not empowered

to recoup unlawfully obtained tax benefits, companies and individuals who violate

the Bank Holding Company Act would obtain an unfair advantage over their

competitors who have complied with the Bank Holding Company Act's

requirements. We therefore conclude the phrase "economic benefits"

encompasses tax benefits derived from a violation of the Bank Holding Company

Act.[11]

Second, Mr. Long argues there was insufficient evidence to support the

economic benefit portion of the penalty entered against him. We must look to the

record to determine if substantial evidence supports this finding.

---

[11] We note the broad interpretation of "economic benefits" finds support in previous Board decisions. For example, in *In re CBC*, the Board determined accounting fees saved as a result of the respondents' violation of the Bank Holding Company Act were economic benefits that should be considered in assessing a civil penalty. 79 Fed. Res. Bull. at 248. Similarly, in *In re Vic Sather & Assocs., Inc.*, 79 Fed. Res. Bull. 160, 164 (1993), the Board concluded saved compliance costs are a "pecuniary benefit" and an "important factor in assessing an appropriate penalty."

At the hearing before the Administrate Law Judge, John S. Gray, Examiner II of the Federal Reserve Bank, testified that as a result of the unlawful merger, Cedar Vale was able to use its net operating loss carry-overs and avoid paying any income taxes from 1990 through 1994.  Mr. Gray testified that if Sumner County and Cedar Vale had not merged, Sumner County's income tax liability from 1990 through 1994 would have been $567,941.  Hence, Cedar Vale and Sumner County derived $567,941 in tax benefits from the violation of the Bank Holding Company Act.

Mr. Gray further testified Mr. Long benefitted directly from these tax savings.  Because Mr. Long was the sole shareholder of both Cedar Vale and Sumner County, Mr. Gray concluded the value of his investment was increased by at least $567,941.  Indeed, even Mr. Long's accountant, Kenneth L. Cooper, Jr., testified Cedar Vale's use of the net operating loss carry-overs benefitted the stockholders of Cedar Vale and Sumner County.  Furthermore, we can easily infer that as the sole shareholder, chairman and president of Cedar Vale, Mr. Long benefited from the tax savings because he had direct control over how these funds were spent.

The unlawful transaction also economically benefited Mr. Long by providing him with a source of income to service the Debt. Through the merger of Sumner County and Cedar Vale, Cedar Vale was able to service the Debt by means of untaxed dividends and estimated tax payments from the Bank of Commerce. In the absence of this merger, Mr. Long, who was a co-maker of the Debt, would have had to service the Debt, at least in part, with personal funds taxable at his individual income rate -- as he had from 1985 through 1989. Thus, because the merger enabled the Debt to be serviced with untaxed funds, Mr. Long derived a significant additional tax benefit from the unlawful transaction. Based on the foregoing record evidence, we conclude the economic benefit portion of the civil penalty is supported by substantial evidence.

### 4. Penalty unreasonable under Administrative Procedure Act

Mr. Long also argues the penalty is "plainly unreasonable and invalid under the [Administrative Procedure Act]."[12] Mr. Long contends his decision to restructure the corporations to realize substantial tax benefits was an exercise of "sound business judgment" that "[a]ny reasonable person ... would try to facilitate

---

[12] Mr. Long does not actually argue the penalty violates any specific provision of the Administrative Procedure Act. We therefore construe his argument as a general attack on the magnitude of the penalty in light of the record in this case.

-25-

... prompt[ly]." According to Mr. Long, the Board substantially contributed to his violation by failing to act within the sixty-day period and by "belatedly granting itself an extension [to act on his application]." Because the Board is partially at fault and because the violation was a technical one with no adverse financial implications for the institutions involved, Mr. Long argues the penalty must be seen as capricious and set aside.

After thoroughly reviewing Mr. Long's contentions, we are strained to find any merit to them. It is true any reasonable person in Mr. Long's position would likely have sought legal ways to avail himself or herself of potential tax savings. However, we are confident no reasonable person would have undertaken the illegal course of conduct Mr. Long pursued. Mr. Long's violation of the Bank Holding Company Act was not merely technical. As discussed in section III.B.2., *supra*, the record reveals Mr. Long proceeded to merge Sumner County and Cedar Vale even though he knew the Board had not approved his application and did not agree with his position that his application had been approved by operation of law. Following the unlawful transaction, Mr. Long attempted to conceal the merger from the Board and Mr. Long refused to reverse the transaction for nearly five years, despite the Board's numerous requests to do so.

Although the Board failed to render a decision on Mr. Long's application within the original sixty-day period, the Board did not in any way contribute to Mr. Long's illegal conduct.  Prior to entering the unlawful transaction, the Board informed Mr. Long's attorney the sixty-day period was merely an internal processing period.  There is nothing in the Board's regulations or correspondence with Mr. Long that reasonably could have led Mr. Long to believe  the failure of the Board to act within this period would result in automatic approval of his application.

We believe the evidence reveals Mr. Long knew the chances of his application being approved by the Board were highly unlikely.  Thus, Mr. Long tried to take advantage of the Board's internal processing period to accomplish and justify what he knew was unlikely to be accomplished lawfully.  The fact none of the institutions involved were harmed by the unlawful transaction does not render Mr. Long's conduct any less egregious.  We find, based on the totality of the circumstances, the Board's penalty against Mr. Long was reasonable, in accordance with applicable law and supported by substantial evidence.

**5. Penalty is denial of due process**

Mr. Long contends the penalty in this case is so excessive it is invalid under the Due Process Clause. Mr. Long reiterates his actions were objectionably reasonable and his violation of the Bank Holding Company Act was technical.

Mr. Long correctly points out the Due Process Clause of the Fourteenth Amendment "imposes substantive limits 'beyond which penalties may not go.'" *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453-54 (1993) (quoting *Seaboard Air Line R. Co. v. Seegers*, 207 U.S. 73, 78 (1907)). However, a penalty must be "grossly excessive" to run afoul of the Due Process Clause. *See id.* at 458. Here, the civil penalty entered against Mr. Long is simply not grossly excessive on the record. As stated, Mr. Long knowingly and intentionally entered into an unlawful transaction. He deliberately concealed this transaction and refused to reverse it for almost five years. Given the duration of Mr. Long's wrongful conduct, the Board was authorized to assess a maximum penalty of $45,600,000 against Mr. Long. *See* 12 U.S.C. § 1847(b)(1). However, the Board decided to impose a penalty of $717,941. In arriving at this amount, the Board appropriately determined a penalty of $567,941 was necessary to deprive him of the fruits of his unlawful conduct. The Board also properly determined a

$150,000 penalty was essential to deter future misconduct.  We conclude the penalty does not violate the Due Process Clause.

**C.  Did the Board Violate the Bank Holding Company Act or Mr. Long's Due Process Rights by Imposing a Penalty in Excess of the Notice of Assessment?**

The Board imposed a penalty of $717,941 against Mr. Long even though the Notice of Assessment of Civil Money Penalties only sought a penalty of $300,000 from Mr. Long.  Mr. Long contends the Board violated the Bank Holding Company Act and his due process rights by imposing a penalty of more than twice the amount stated in the original notice.[13]

**1.  Bank Holding Company Act**

We first review Mr. Long's argument the increased penalty is not permitted under the Bank Holding Company Act.  12 U.S.C. § 1818(i)(2)(F) provides "[a]ny appropriate Federal banking agency may compromise, *modify*, or remit any penalty which such agency may assess or had already assessed."  (Emphasis added.)  The Board contends the use of the term "modify" in this provision grants

---

[13]  The Board argues we should not consider these issues because Mr. Long failed to raise them before the Board.  We assume, without deciding, Mr. Long raised before the Board the issues of whether an increased penalty violated the Bank Holding Company Act, and his due process rights.

the Board authority to decrease or increase the amount of a civil penalty. Mr. Long, however, contends the word "modify," when read in conjunction with "compromise" and "remit," must be construed as authorizing only a reduction of a civil penalty.

In interpreting a statute, the starting point is the statutory language. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Id.* "In other words, '[u]nless the statutory language is ambiguous or would lead to absurd results, the plain meaning of the statute must control.'" *United States v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992) (quoting *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1498 (11th Cir. 1991)), *cert. denied*, 507 U.S. 951 (1993).

Webster's Ninth New Collegiate Dictionary (1987) provides, *inter alia*, the following definitions for modify: "to make less extreme;" "to make minor changes in;" "to make basic or fundamental changes in" and "to undergo change." Thus, the dictionary provides support for both Mr. Long's and the Board's interpretation of the term modify. Similarly, the Random House Thesaurus (1984) provides the following synonyms for modify: "alter," "vary," "change," "reduce,"

"moderate," and "temper." Because both Mr. Long's and the Board's interpretation of "modify" find dictionary and thesaurus support, we conclude the term "modify," as used in 18 U.S.C. § 1818(i)(2)(F), is ambiguous.[14]

Where the plain language of a statute is ambiguous and Congress has not spoken on the issue, we must give considerable deference to an agency's interpretation of a statute it is charged with administering. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). We must sustain the agency's construction of the statute as long as its construction is reasonable. *Id.* at 845.

Here, we believe the Board's interpretation of "modify" as permitting the Board to increase or decrease a civil penalty is reasonable for several reasons. First, as previously mentioned, the interpretation finds support in both Webster's Dictionary and Random House's Thesaurus. *See supra.* Second, the Board's interpretation is consistent with other rules of statutory construction. The Supreme Court has stated that, if possible, a statute must be construed in such a

_____

[14] It appears there is no legislative history concerning Congress' intent with respect to the term modify. Neither party has provided the court with any legislative history on the issue, and our independent research has failed to uncover any direct statements of Congress' intent with respect to the term modify.

manner that every word has some operative effect. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36 (1992). It is the court's duty to attempt to give effect to every clause and word of a statute. *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). Similarly, we have determined the use of a disjunctive in a statute generally indicates alternatives were intended. *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1349 (10th Cir. 1987).

Here, the relevant statute permits the Board to "compromise, modify, or remit" any civil penalty. 12 U.S.C. § 1818(i)(2)(F). Both of the parties agree the term "remit" merely permits the Board to reduce a statutory penalty. If we were to interpret the term "modify" to allow only a reduction of a statutory penalty, we would not be giving the term "modify" any separate effect. Rather, we would be interpreting modify in the same manner as remit, rendering the term redundant. On the other hand, interpreting modify to permit an increase or decrease in the statutory penalty, as the Board contends, is consistent with the aforementioned rules of statutory construction. Such an interpretation acknowledges the use of a disjunctive and gives operative effect to each of the statute's words. Because the Board's interpretation is harmonious with prevailing rules of statutory construction, we find its interpretation to be reasonable.

We also believe the Board's interpretation of 12 U.S.C. § 1818(i)(2)(F) is reasonable on policy grounds. As discussed, the Board is required, in assessing a civil penalty, to consider the economic benefit derived from the violation. 12 C.F.R. § 263.62. In many cases, as in the present case, the economic benefit obtained will be a substantial portion of the penalty. Often times, however, the economic benefit derived from the violation will increase after the Notice of Assessment is filed. In order for the Board to recoup the full economic benefit and effectively punish the violator, the Board must have the authority to assess a penalty greater than that set forth in the Notice of Assessment. Thus, we conclude the Board's interpretation of 12 U.S.C. § 1818(i)(2)(F) as permitting the Board to increase the amount of a civil penalty is reasonable and in accordance with law. Because this interpretation is reasonable, the penalty assessed against Mr. Long did not violate the Bank Holding Company Act.

### 2. Due Process Rights

Mr. Long also argues the increased civil penalty violated his due process rights. According to Mr. Long, the Notice of Assessment did not provide him with fair notice of the penalty the government could impose. Section 554 of the Administrative Procedure Act requires procedural fairness in the administrative process. *Rapp v. United States Dept. of Treasury*, 52 F.3d 1510, 1519 (10th Cir.

1995). According to 5 U.S.C. § 554(b)(3) (1994), an individual entitled to notice of an agency hearing must "be timely informed of ... the matters of fact and law asserted." However, "[a]s long as a party to an administrative proceeding is reasonably apprised of the issues in controversy, and is not misled, the notice is sufficient." *Savina Home Indus., Inc. v. Secretary of Labor*, 594 F.2d 1358, 1365 (10th Cir. 1979); *Rapp*, 52 F.3d at 1520. To establish a due process violation, an individual must show he or she has sustained prejudice as a result of the allegedly insufficient notice. *Rapp*, 52 F.3d at 1520; *Abercrombie v. Clarke*, 920 F.2d 1351, 1360 (7th Cir. 1990), *cert. denied*, 502 U.S. 809 (1991).

In the instant case, the Recommended Decision of the Administrative Law Judge provided Mr. Long with adequate notice of the penalty that could be imposed upon him. Following the Recommended Decision, Mr. Long was given thirty days to challenge the recommended increase in penalty. *See* 12 C.F.R. § 263.39(a). However, Mr. Long did not challenge the increased penalty on due process grounds.

Even if Mr. Long did not receive adequate notice of the potential civil penalty, Mr. Long has not demonstrated he was prejudiced by such notice. Mr. Long has failed to allege how he would have conducted the litigation any

-34-

differently if the final penalty had been stated in the Notice of Assessment. Mr. Long merely alleges that based upon the penalty alleged in the Notice of Assessment, he chose his son, a "comparatively inexperienced lawyer with a potential conflict of interest," to represent him at the hearing. However, Mr. Long points to no specific actions his son took at the hearing that were prejudicial to his case. Nor does he allege that a more experienced attorney could have achieved a better result for Mr. Long.

The record reveals that despite James Long's alleged legal inexperience, Mr. Long placed a significant amount of confidence in his son's legal skills. At the time of the hearing, James Long had been providing legal services for his father and his father's companies for nearly five years. Although James Long also was charged with violating the Bank Holding Company Act, we do not believe this prejudiced Mr. Long or affected the representation he received from his son.[15]

Moreover, in addition to the representation James Long provided his father at the hearing, Mr. Long was also represented by attorney J. Greg Kite. Mr. Kite represented Mr. Long throughout the administrative proceedings and Mr. Kite

---

[15] James Long settled the charges against him on the day the hearings began before the Administrative Law Judge.

took an active role at the hearing. Thus, we conclude Mr. Long has not established he was prejudiced by the representation he received from his son at the hearing. Accordingly, Mr. Long has not shown he was prejudiced by the allegedly insufficient notice he received.

Because we find Mr. Long received adequate notice the penalty could be increased, and because we find Mr. Long was not prejudiced by the Notice of Assessment, we conclude Mr. Long's due process rights were not violated.

## IV. CONCLUSION

Based on the foregoing reasons, we hereby **AFFIRM** the Board's Final Decision and penalty in the amount of $717,941 against Mr. Long.