United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 8, 1997 Decided February 10, 1998 

 No. 97-1114

 Ghaith R. Pharaon, 

 Petitioner

 v.

 Board of Governors of the Federal Reserve System, 

 Respondent

 On Petition for Review of an Order of the 

 Federal Reserve System

 Richard F. Lawler argued the cause for petitioner. With 
him on the briefs were Philip M. Smith and John C. Canoni.

 Stephen H. Meyer, Senior Attorney, Board of Governors of 
the Federal Reserve System, argued the cause for respon-
dent. With him on the brief were James V. Mattingly, Jr., 
General Counsel, Richard M. Ashton, Associate General 
Counsel, and Katherine H. Wheatley, Assistant General 


Counsel. Douglas B. Jordan, Senior Counsel, entered an 
appearance.

 Before: Ginsburg, Henderson and Tatel, Circuit Judges.

 Opinion for the Court by Circuit Judge Tatel.

 Tatel, Circuit Judge: Petitioner challenges the Board of 
Governors' conclusion that he participated in violations of the 
Bank Holding Company Act by the Bank of Credit and 
Commerce International. He also challenges the Board's 
decision to fine him thirty-seven million dollars and bar him 
permanently from the U.S. banking industry. Because sub-
stantial evidence supports the Board's findings of fact and 
because petitioner's challenges to the Board's procedures, 
conclusions of law, and choice of sanctions lack merit, we 
affirm.

 I

 Section 3(a) of the Bank Holding Company Act makes it 
unlawful for a company to become a bank holding company 
without approval of the Board of Governors of the Federal 
Reserve System. 12 U.S.C. s 1842(a)(1) (1994). In a Sep-
tember 1991 Notice of Assessment, the Board charged peti-
tioner Ghaith R. Pharaon, a prominent Saudi Arabian busi-
nessman and major shareholder in the Bank of Credit and 
Commerce International ("BCCI"), with participating in a 
scheme through which BCCI, using Pharaon as an undis-
closed "nominee" or front, secretly acquired control of Inde-
pendence Bank, a medium-sized California lender, in violation 
of section 3(a) of the Act. According to the Board, the 
scheme was intended to solve two problems BCCI faced in 
the mid-1980's: accumulated losses of over a billion dollars 
and pressure from Luxembourg, BCCI's nominal home coun-
try, to find a new country capable of regulating an institution 
operating in nearly seventy nations. Ownership of Indepen-
dence would solve the first problem by generating profits for 
BCCI and the second by laying the groundwork for transfer-
ring BCCI's oversight to U.S. banking agencies. Pharaon's 
participation in the scheme, the Board asserted, allowed 


BCCI to mask its control of Independence from federal 
regulators, preventing them from obtaining an accurate view 
of Independence's true management and resources. The 
Board charged that from 1985, when BCCI secretly pur-
chased Independence, until 1991, when bank regulators from 
several countries seized BCCI, BCCI controlled Indepen-
dence, infusing capital into the bank, approving selection of 
its directors, and actively participating in its management.

 In addition to charging Pharaon with participating in 
BCCI's section 3(a) violation, the Notice of Assessment 
charged that during the period BCCI secretly controlled 
Independence the annual reports (known as Y-7s) that BCCI 
was required to submit to the Board as a foreign bank with 
U.S. branches, see id. s 3106(a), concealed its control of the 
bank in violation of section 5(c) of the Act, id. s 1844(c), and 
its implementing regulation, Regulation Y, 12 C.F.R. s 225.5 
(1997). The Notice held Pharaon responsible for BCCI's 
violations under the Act's individual liability provision, section 
8(b), 12 U.S.C. s 1847(b), and proposed a thirty-seven million 
dollar civil penalty. Considering Pharaon "institutional[ly]-
affiliated" with BCCI under 12 U.S.C. s 1813(u), the Notice 
also sought an order of prohibition pursuant to section 8(e) of 
the Federal Deposit Insurance Act, id. s 1818(e)(1), perma-
nently barring him from participating in the affairs of any 
federally insured depository.

 Shortly after the Board issued its Notice, a federal grand 
jury sitting in Washington, D.C., indicted Pharaon for crimi-
nal offenses relating to BCCI's purchase of Independence. 
The following year, another federal grand jury, this one 
sitting in Miami, Florida, and a state grand jury in New York, 
each indicted Pharaon in connection with his larger involve-
ment with BCCI. Bench warrants for Pharaon's arrest were 
issued in connection with the Washington and Miami indict-
ments. Pharaon responded to neither.

 In the meantime, from his home in Saudi Arabia and acting 
through U.S. counsel, Pharaon answered the Board's Notice 
of Assessment, denying all charges and requesting a hearing. 
Citing Pharaon's decision to remain beyond the reach of 


federal prosecutors and relying on fugitive disentitlement, a 
doctrine allowing courts to sanction parties where their fugi-
tive status has "some connection" to the proceeding, 
Daccarett-Ghia v. Commissioner, 70 F.3d 621, 624 (D.C. Cir. 
1995), the Administrative Law Judge recommended ruling 
summarily for the Board. In a 1994 decision, the Board 
declined to adopt the ALJ's recommendation, rejecting the 
use of fugitive disentitlement because Pharaon's physical 
presence was unnecessary to a hearing, because the Board 
had no responsibility to vindicate any affront to the courts 
that had indicted Pharaon, and because any judgment against 
Pharaon could be satisfied from his frozen assets. The Board 
made clear, however, that on remand the ALJ could use his 
"express and implicit procedural powers" to ensure that 
Pharaon's fugitive status not disrupt the proceedings.

 Following a nineteen-day hearing, the ALJ issued a recom-
mended decision finding in favor of the Board and approving 
the penalties sought in the Notice of Assessment. Filing 179 
pages of exceptions challenging virtually all of the ALJ's 
findings of fact and conclusions of law, Pharaon appealed to 
the Board. Board enforcement counsel also appealed, argu-
ing that the ALJ should have imposed the maximum statuto-
ry penalty of $111.5 million (calculated by totaling the days 
each violation had been outstanding at the time the Board 
issued the Notice--8299 days--and assessing a penalty of 
$1000 for each day prior to August 10, 1989, when Congress 
amended the Act to increase its penalties, and $25,000 per 
day thereafter, see Financial Institutions Reform, Recovery, 
and Enforcement Act of 1989, Pub. L. No. 101-73, s 907(j)(2), 
103 Stat. 183, 475 (1989) ("FIRREA") (codified at 12 U.S.C. 
s 1847(b)(1))). The Board adopted the ALJ's recommended 
decision.

 Pharaon now petitions for review. Applying the standards 
set forth in the Administrative Procedure Act, see 12 U.S.C. 
ss 1818(h), 1847(b)(3) (APA applies to penalty assessment 
hearings under the Bank Holding Company Act), we will set 
aside the Board's factual findings only if unsupported by 
substantial evidence on the record as a whole, 5 U.S.C. 
s 706(2)(E) (1994); we will set aside the Board's legal conclu-


sions only if "arbitrary, capricious, an abuse of discretion, or 
otherwise not in accordance with law," id. s 706(2)(A).

 II

 We begin with Pharaon's challenges to the Board's finding 
that BCCI violated the Bank Holding Company Act. The Act 
makes it "unlawful, except with the prior approval of the 
Board ... for any action to be taken that causes any compa-
ny to become a bank holding company." 12 U.S.C. s 1842(a). 
A company becomes a bank holding company if, among other 
things, "(A) the company directly or indirectly ... owns, 
controls, or has power to vote 25 per centum or more of any 
class of voting securities of the bank or company; [or] (B) the 
company controls in any manner the election of a majority of 
the directors or trustees of the bank or company." Id. 
s 1841(a)(2)(A)-(B). The Act provides for bank holding com-
panies to file periodic reports with the Board to facilitate 
Board oversight. Id. s 1844(c); 12 C.F.R. s 225.5. Find-
ing that BCCI controlled more than twenty-five percent of 
Independence's voting stock, as well as the election of a 
majority of its directors, the Board concluded that BCCI had 
become a holding company within the meaning of both sub-
sections (A) and (B) and that it concealed its unlawful control 
by filing Y-7s that flatly denied controlling any U.S. banks.

 For its subsection (A) finding, the Board relied primarily 
on a May 17, 1985, agreement between Pharaon and the 
International Credit and Investment Company (Overseas) 
Ltd. ("ICIC"), a BCCI-controlled company. Titled "Acquisi-
tion of Shares of Independence Bank," and signed by Phar-
aon and Swaleh Naqvi, BCCI's then-second-in-command, the 
agreement provides in relevant part as follows:

 1. [Pharaon and ICIC] have agreed to acquire 100% of 
 shares capital of the Bank (the said shares) from the 
 present shareholders thereof....

 2. All the said shares of the Bank on their purchase as 
 aforesaid shall be transferred to and held in the name of 
 [Pharaon] but only 15% of the said shares of the Bank 
 will be held by [Pharaon] as beneficial owner thereof.


 3. For the balance of 85% of the said shares of the 
 Bank, ICIC shall have the right to purchase them at 
 their cost price from [Pharaon] either in its own name or 
 in the name or names of its nominee or nominees and, till 
 [sic] such purchase is effected and the shares transferred 
 to the name of ICIC and/or its nominee or nominees, 
 [Pharaon] will hold them in a fiduciary capacity for ICIC.

 4. ICIC will provide funds to, or otherwise procure a 
 loan for [Pharaon] of the cost of 85% of the said shares of 
 the Bank and in consideration of the premises mentioned 
 in 3 above, ICIC will itself pay or discharge all interest, 
 costs, charges, commission and/or expenses of and inci-
 dental to the said loan and repayment thereof and hold 
 [Pharaon] indemnified and harmless in respect thereof.

The agreement also entitled ICIC to dividends issued on its 
shares, gave ICIC the right to possess Independence's share 
certificates, and prohibited Pharaon from disposing of ICIC's 
shares.

 Relying on the "right to purchase" language in paragraph 
three, Pharaon argues that the agreement merely gave ICIC 
an option to purchase, vesting it with no actual control. The 
Board rejected this argument, as do we. The agreement 
plainly states that Pharaon will hold only fifteen percent of 
Independence beneficially (paragraph two), and that ICIC 
will fund Pharaon's purchase of the remaining eighty-five 
percent (paragraph four). Not only does paragraph three 
itself specifically provide that Pharaon "will hold" the eighty-
five percent "in a fiduciary capacity for ICIC," but Naqvi 
testified that the "right to purchase" language simply clarified 
BCCI's right to become nominal as well as beneficial owner of 
the shares.

 Pharaon also claims the parties neither effectuated nor 
followed the agreement, but the record contains substantial 
evidence to support the Board's contrary finding. The Board 
pointed to evidence that BCCI provided over $10 million of 
Independence's $23 million initial purchase price, that BCCI 
issued a $5 million guarantee to support a $12.6 million loan 
Pharaon obtained from the Bank of Boston for the remaining 
amount of the purchase, and that BCCI later refinanced the 


Bank of Boston loan, taking physical possession of Pharaon's 
Independence stock certificates in accordance with the agree-
ment. Additional evidence that the parties implemented the 
agreement comes from a June 1986 meeting at which Pharaon 
proposed to Naqvi and Agha Hasan Abedi, then-head of 
BCCI, to increase his share of Independence from fifteen 
percent to fifty percent. Subsequently changing his mind, 
Pharaon sent Naqvi a handwritten note stating that "I would 
suggest that for the time being the 15/85 arrangement be 
maintained until we can determine the course we want Inde-
pendence to take."

 Pharaon's other arguments provide no basis for overturn-
ing the Board's subparagraph (A) finding. Although he 
claims that BCCI's financing of Pharaon's purchase of Inde-
pendence cannot by itself support a finding of control under 
the Act, the Board's determination that BCCI controlled 
Independence rested not just on BCCI's financial support, 
but also on the entire record, including the plain language of 
the 1985 agreement, the 1986 meeting with Abedi and Naqvi, 
and Pharaon's follow-up note. Pharaon points to evidence in 
the record that he too helped manage Independence and 
contributed to its capital requirements. Because we must 
consider the entire record before us, however, such evidence 
in no way undermines the Board's conclusion that BCCI, not 
Pharaon, controlled Independence. Pharaon claims that the 
ALJ improperly relied on allegations that he acted as a 
nominee for BCCI in transactions not at issue in the Indepen-
dence proceeding. At the beginning of his recommended 
decision, however, the ALJ made quite clear that he consid-
ered such matters only for background and to demonstrate 
Pharaon's financial condition, not to prove the violations 
relating to Independence.

 While we can uphold the Board's conclusion that BCCI 
controlled Independence solely on the basis of its subsection 
(A) finding, we note that the record also contains substantial 
evidence to support the Board's subsection (B) finding that 
BCCI controlled the election of at least three members of 
Independence's five-member board of directors. Abedi se-
lected Kemal Shoaib to serve as Independence's CEO and 


chairman, Shoaib received pension and other fringe benefits 
from BCCI, and Shoaib remained in active contact with BCCI 
while at Independence. A Shoaib letter to Naqvi states that 
another director, a Morrison & Foerster partner, was "nomi-
nated by us." When a third board position opened, Shoaib 
wrote to Naqvi seeking approval for two potential candidates. 
Although Pharaon points to some genuine inconsistencies in 
other ALJ findings about BCCI's involvement in the selection 
of Independence personnel, the Board's finding that BCCI 
controlled a majority of the Independence board finds firm 
support in the record.

 Challenging the Board's interpretation of the Act's penalty 
provisions, Pharaon argues that regardless of BCCI's viola-
tions, he cannot be penalized for acting as BCCI's undisclosed 
nominee. The Board found Pharaon personally liable under 
section 8(b) of the Act, which authorizes the Board to levy 
civil penalties against "[a]ny company which violates, and any 
individual who participates in a violation of, any provision of 
this chapter, or any regulation or order issued pursuant 
thereto." 12 U.S.C. s 1847(b)(1). Comprehensively over-
hauling the regulation of financial institutions in 1989, Con-
gress added a new subsection 1847(d), which provides three 
tiers of penalties for "any company" that commits a reporting 
violation. FIRREA s 911(e), 103 Stat. at 481 (codified at 12 
U.S.C. s 1847(d)). According to Pharaon, because subsection 
(d) mentions only companies, individuals are no longer liable 
for reporting violations under subsection (b). Although the 
Board responds that repeals by implication are disfavored, we 
need not invoke that familiar canon of statutory interpreta-
tion because we cannot even discern a basis for implying a 
repeal. Establishing a range of penalties for reporting viola-
tions by companies, FIRREA has no bearing on section 
1847(b)'s long-standing and still-existing provision for indi-
vidual liability other than to increase maximum penalties 
from $1000 to $25,000 per day. See Chevron U.S.A. Inc. v. 
Natural Resources Defense Council, Inc., 467 U.S. 837, 842 
(1984) ("If the intent of Congress is clear, that is the end of 
the matter...."). Congress passed FIRREA to strengthen 
"the enforcement powers of Federal regulators of depository 


institutions" and "the civil sanctions and criminal penalties for 
defrauding or otherwise damaging depository institutions and 
their depositors." FIRREA s 101(9), (10), 103 Stat. at 187. 
We cannot imagine that Congress would have exempted 
individuals from liability for false reports without saying so.

 We are equally unpersuaded by Pharaon's argument that 
the Board lacked evidence to connect him to BCCI's scheme. 
Sweeping broadly, section 1847(b) reaches any action "caus-
ing, bringing about, participating in, counseling, or aiding or 
abetting" a violation of the Act. 12 U.S.C. s 1847(b)(5). 
Nothing in the Act requires that Pharaon have known the 
details of BCCI's plan to conceal its ownership of Indepen-
dence. Interamericas Invs., Ltd. v. Board of Governors of 
the Fed. Reserve Sys., 111 F.3d 376, 384 (5th Cir. 1997). It is 
enough, as the Board found, that Pharaon agreed to act as 
BCCI's nominee. As BCCI's nominee, he could be held 
responsible for acts undertaken by BCCI to further its secret 
purchase of Independence, such as filing false reports with 
U.S. regulators.

 III

 Having thus upheld the Board's twin findings that BCCI 
violated the Act by secretly acquiring Independence and that 
Pharaon, serving as the scheme's lynchpin, is personally liable 
as a participant, we turn to Pharaon's procedural challenges. 
He claims principally that the ALJ improperly denied him 
discovery and excluded testimony by misapplying the fugitive 
disentitlement doctrine.

 As we read the record, the ALJ mentioned Pharaon's 
absence as a consideration in connection with just one ruling 
Pharaon challenges: a July 1995 decision allowing only live 
testimony at the hearing. Pharaon treats this ruling as a 
form of fugitive disentitlement. We think the Board offers a 
more accurate interpretation: The ALJ did not punish Phar-
aon for his fugitive status, but merely relied on what the 
Board referred to in its 1994 decision as his "express and 
implicit procedural powers" to ensure that Pharaon's fugitive 
status not adversely affect the hearing. Later making this 
point explicit, the ALJ explained that "the importance of 


visual observations of witnesses" significantly influenced his 
ruling requiring Pharaon to appear in person. Given the 
significance of personal observation to credibility determina-
tions, we cannot say that this ruling amounted to an abuse of 
discretion. We reach the same conclusion with respect to 
another ruling, also challenged by Pharaon, in which the ALJ 
"similarly order[ed]" that a witness Pharaon proposed on the 
eve of the hearing could only appear in person.

 Citing fugitive disentitlement, Pharaon challenges several 
other discovery rulings. See Pet'r Br. at 53 ("Pharaon was 
thus denied the basic rudiments of due process, apparently 
based on the disentitlement doctrine."). Because none of the 
rulings rested on fugitive disentitlement, however, we need 
not consider them further.

 Pharaon also claims that the Board failed to disclose 127 
unspecified files of relevant documents and an agreement 
with the New York District Attorneys' Office immunizing 
Naqvi for his testimony. Offering no grounds to support 
these challenges, Pharaon has waived them. Terry v. Reno, 
101 F.3d 1412, 1415 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 
2431 (1997).

 Next, Pharaon claims ALJ bias, relying chiefly on a state-
ment made by the ALJ in his 1993 ruling on fugitive disen-
titlement. Claims of bias must "be raised as soon as practica-
ble after a party has reasonable cause to believe that grounds 
for disqualification exist." Marcus v. Director, Office of 
Workers' Compensation Programs, 548 F.2d 1044, 1051 (D.C. 
Cir. 1976) (footnote omitted). Aware of the ALJ's alleged 
bias when he appealed the recommended decision to the 
Board, Pharaon failed to raise the issue or argue that the 
case should be remanded to a different ALJ. He has thus 
waived his principal ground for asserting bias. Other evi-
dence of alleged bias--the ALJ's record of ruling in favor of 
the Board in other proceedings and his allegedly incorrect 
rulings against Pharaon in this case--falls far short of demon-
strating that the ALJ had "a fixed opinion--'a closed mind on 
the merits of the case.' " Throckmorton v. NTSB, 963 F.2d 
441, 445 (D.C. Cir. 1992) (quoting United States v. Haldeman, 
559 F.2d 31, 136 (D.C. Cir. 1976)). "Almost invariably, [such 


rulings] are proper grounds for appeal, not for recusal." 
Liteky v. United States, 510 U.S. 540, 555 (1994).

 Pharaon's final procedural challenge, presented only in a 
sparse footnote, invokes 5 U.S.C. s 557(c), which states that 
"[b]efore ... a decision on agency review of the decision of 
subordinate employees, the parties are entitled to a reason-
able opportunity to submit ... exceptions to the ... recom-
mended decision[ ] ... [and][t]he record shall show the ruling 
on each ... exception presented." Pharaon faults the Board 
for failing to respond with specificity to each of his many 
exceptions to the ALJ's recommended decision. Section 
557(c) functions as a bedrock of judicial review of agency 
action. We have long held, however, that agencies need only 
indicate that they have considered and rejected a party's 
exceptions, see Human Dev. Ass'n v. NLRB, 937 F.2d 657, 
668 (D.C. Cir. 1991), and that they have no obligation to 
respond at all to entirely insubstantial arguments, Interna-
tional Ass'n of Bridge, Structural & Ornamental Iron Work-
ers v. NLRB, 792 F.2d 241, 247-48 (D.C. Cir. 1986). "As-
sum[ing]" Pharaon to be challenging the ALJ's recommended 
decision "in its entirety," the Board said that it had reviewed 
Pharaon's submission and denied his exceptions. From our 
own review of the Board's decision and Pharaon's exceptions, 
we are satisfied that the agency in fact considered and 
rejected all of them. To be sure about this, at oral argument 
we asked Pharaon's counsel to identify any significant excep-
tions to which the Board failed to respond. He offered none.

 IV

 This brings us finally to Pharaon's statutory and constitu-
tional challenges to the penalties. In keeping with our limit-
ed review of agency penalty assessments, we will not overturn 
the Board's choice of sanctions unless they are either " 'un-
warranted in law or ... without justification in fact.' " Blue-
stone Energy Design, Inc. v. FERC, 74 F.3d 1288, 1294 (D.C. 
Cir. 1996) (quoting Butz v. Glover Livestock Comm'n Co., 411 
U.S. 182, 185-86 (1973)) (ellipsis in original).


 Citing the difference between his thirty-seven million dollar 
penalty and the range of penalties set out in a Board Civil 
Money Penalty Assessment Matrix and claiming the Board 
failed to follow a thirteen-factor test set forth in an Inter-
agency Policy Regarding the Assessment of Civil Money 
Penalties by the Federal Financial Institutions Regulatory 
Agencies, 45 Fed. Reg. 59,423, 59,424-25 (1980), Pharaon 
urges us to set aside the penalty as arbitrary and capricious 
in violation of the APA. According to the Board, neither the 
matrix nor the interagency policy limits its discretion.

 We agree with the Board about the matrix. An internal, 
staff-level guideline, the matrix cautions that "because the 
facts and circumstances of each penalty case are different, the 
assessment of a civil money fine cannot be completely re-
duced to the mechanical application of a formula or purely 
numerical index. The exercise of judgment based on exper-
tise and experience is important and necessary." Because 
the matrix does not constrain the Board's discretion, the 
agency had no obligation to explain any departure from it. 
See, e.g., Vietnam Veterans of Am. v. Secretary of the Navy, 
843 F.2d 528, 539 (D.C. Cir. 1988) (where no indication that 
agency intended to bind itself by staff memorandum, docu-
ment not binding).

 In contrast to the matrix, the Board has expressly adopted 
the interagency policy. See In re Cedar Vale Bank Holding 
Co., 82 Fed. Res. Bull. 871 (1996), aff'd sub. nom. Long v. 
Board of Governors of the Fed. Reserve Sys., 117 F.3d 1145 
(10th Cir. 1997). Considering the factors listed in the inter-
agency policy, the ALJ concluded that Pharaon's violations 
would yield a penalty of slightly over $151 million, well above 
the statutory maximum. Although the Board's January 1997 
final decision does not review each factor in turn, a compari-
son of the Board's decision with the interagency policy indi-
cates that the Board in fact considered each factor relevant to 
this case. When we asked Pharaon's counsel about this at 
oral argument, he was unable to point to any relevant factor 
the Board ignored.


 Pharaon correctly observes that the Board nowhere tells us 
how its enforcement counsel originally selected thirty-seven 
million dollars. But we will "uphold a decision of less than 
ideal clarity if the agency's path may reasonably be dis-
cerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. 
Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Detroit/Wayne 
County Port Auth. v. ICC, 59 F.3d 1314, 1317 (D.C. Cir. 
1995). This is just such a case. Thirty-seven million dollars 
reflects the approximate amount the Board found BCCI 
invested in Independence, as well as approximating the mag-
nitude of the gains sought and the potential harm posed by 
Pharaon's facilitation of BCCI's secret takeover of a bank 
worth several hundred million dollars. After weighing the 
mitigating factors set forth in 12 U.S.C. s 1818(i)(G)(i)-(iv)--
"(i) the size of financial resources and good faith of the ... 
person charged; (ii) the gravity of the violation; (iii) the 
history of previous violations; and (iv) such other matters as 
justice may require"--the Board found the penalty "in line 
with the gravity of the offenses, the intentional nature of the 
actions, [and] the attempts to conceal the nature of the 
transactions." Under all of these circumstances, we find 
nothing arbitrary and capricious in the Board's selection of 
the penalty. Indeed, had the Board applied the penalty 
standards set forth in 12 U.S.C. s 1847(b), as Board enforce-
ment counsel urged, it could have imposed a penalty of over 
$111 million, three times the amount it actually assessed. 
Although Pharaon challenged the calculation of this maximum 
penalty before the Board, he does not do so here.

 Pharaon's principal constitutional challenge to the thirty-
seven million dollar penalty rests on the Eighth Amendment's 
Excessive Fines Clause, U.S. Const. amend. VIII ("Excessive 
bail shall not be required, nor excessive fines imposed, nor 
cruel and unusual punishments inflicted."). Protecting indi-
viduals against government power to extract payments as 
punishment, Austin v. United States, 509 U.S. 602, 609-10 
(1993), the Excessive Fines Clause requires us to consider the 
" 'value of the fine in relation to the offense.' " United States 
v. Emerson, 107 F.3d 77, 80 (1st Cir. 1997) (quoting Austin, 
509 U.S. at 627 (Scalia, J., concurring)), cert. denied, 118 


S. Ct. 61 (1997). Reviewing the question de novo, see Lam-
precht v. FCC, 958 F.2d 382, 391 (D.C. Cir. 1992), we discern 
no Eighth Amendment violation. As we have already indicat-
ed in rejecting Pharaon's APA challenge, the penalty is 
proportional to his violation and well below the statutory 
maximum.

 Pharaon's Fifth Amendment claim has even less merit. He 
relies on the Supreme Court's statement in BMW of North 
Am. v. Gore, 116 S. Ct. 1589 (1996), that "[e]lementary 
notions of fairness enshrined in our constitutional jurispru-
dence dictate that a person receive fair notice not only of the 
conduct that will subject him to punishment but also of the 
severity of the penalty that a State may impose." Id. at 1598. 
Here, section 1847(b)'s maximum penalty provisions provided 
just that notice. Because the assessed penalty falls far below 
the statutory maximum, Pharaon cannot claim that he lacked 
constitutionally adequate notice. Cf. Long, 117 F.3d at 1156 
(upholding a $717,941 penalty against due process challenge 
when statute authorized Board to assess a maximum penalty 
of $45.6 million). We need not consider Pharaon's Double 
Jeopardy claim because he failed to include it in his excep-
tions to the ALJ's recommended decision. See 12 C.F.R. 
s 263.39(b)(1) (1997) (failure to raise exception constitutes 
waiver).

 For his final argument, Pharaon claims that the Board had 
no basis under 12 U.S.C. s 1818(e)(1)(A)-(C) for its order 
permanently barring him from participating in the affairs of 
any federally insured depository. He offers no challenge to 
the Board's subsections (A) and (C) findings, and for good 
reason: It is undeniable that he "violated [the] law," id. 
s 1818(e)(1)(A)(i), and that his violation at least "involve[d] 
personal dishonesty," id. s 1818(e)(1)(C). Pharaon claims 
only that the record contains insufficient evidence to support 
the Board's finding under subsection (B), the so-called effects 
prong, see Oberstar v. FDIC, 987 F.2d 494, 502 (8th Cir. 
1993), which requires that the Board establish that:

 by reason of the violation ... (i) such insured depository 
 institution or business institution has suffered or will 


 probably suffer financial loss or other damage; (ii) the 
 interests of the insured depository institution's deposi-
 tors have been or could be prejudiced; or (iii) such party 
 has received financial gain or other benefit by reason of 
 such violation, practice, or breach.

12 U.S.C. s 1818(e)(1)(B).

 According to Pharaon, subsection (B) requires the Board to 
demonstrate the exact amount of harm caused by Pharaon's 
participation in BCCI's scheme. The plain language of the 
statute provides to the contrary, however. Section 
1818(e)(1)(B) allows the Board to impose an order of prohibi-
tion not only if the insured institution "suffered ... financial 
loss or other damage" or if the interests of its depositors 
"have been ... prejudiced," but also if the institution "will 
probably suffer financial loss or other damage" or if its 
depositors "could be prejudiced." Id. Under all the circum-
stances of this case, we think the Board had ample basis for 
concluding that as a result of BCCI's secret takeover of 
Independence and Pharaon's participation in the scheme, 
BCCI "will probably suffer financial loss or other damage" 
and its depositors "could be prejudiced." Indeed, BCCI's 
unrecoverable investment in the now-defunct Independence 
represents adequate "financial loss or other damage" for 
purposes of the prohibition order.

 V

 Because the Board's findings of fact are supported by 
substantial evidence in the record and because we discern no 
reversible errors in the Board's procedures, legal conclusions, 
or choice of sanctions, we affirm.

So ordered.